1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

XAIVER S. WILLIAMS,                        No.  2:12-cv-00899 JAM CKD P

12

        Petitioner,

13

    v.                                    FINDINGS AND RECOMMENDATIONS

14

L.S. McEWEN,

15

        Respondent.

16

17       Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus

18  pursuant to 28 U.S.C. § 2254.  He challenges his 2008 judgment of conviction in the Sacramento

19  County Superior Court for assault with a firearm, discharging a firearm at an inhabited dwelling,

20  second-degree murder, and several special allegations, for which he was sentenced to a state

21  prison term of seventy-two years to life.  He asserts nine claims challenging his conviction and

22  sentence as violative of his Constitutional rights.  (ECF No. 5 ("Ptn.").)  Respondent has filed an

23  answer to the petition, (ECF No. 23), and petitioner has filed a traverse, (ECF No. 33).  Upon

24  careful consideration of the record and the applicable law, the undersigned will recommend that

25  the petition be denied.

26  ////

27  ////

28  ////

1

# BACKGROUND

I. Factual Background

In its affirmation of the judgment on appeal, the California Court of Appeal, Third Appellate District, set forth the relevant factual background as follows:

**The Consolidation of the Cases**

In case No. 05F06418, the People filed a complaint on July 11, 2005, charging defendant with assault with a firearm on July 7, 2005. (The offense of discharging a firearm into an inhabited dwelling was not alleged at this time.) In case No. 05F11333, the People filed a complaint charging defendant with murder on December 22, 2005, which is not in the record. After preliminary hearings were conducted and defendant was held to answer in both cases, the People filed a consolidated information.

**Preliminary hearings**

**Case No. 05F06418**

Sacramento Police Officer Yul Alameda testified that around 7:45 p.m. on July 7, 2005, he took a brief statement from Marlon Leon, the victim, at his residence on Stoddard Street in Sacramento County, and then later did a more complete interview at the hospital.

Officer Alameda found Leon sitting in the threshold of the open front door of his home; his right foot, and its big toe in particular, was bloody. There were shell casings in the roadway in front of the house and two or three bullet holes a few feet to the side of the front door.

Around 10:00 p.m., Officer Alameda interviewed Leon at the hospital. Leon said that earlier that day he and Iris Luna had driven from his house to a nearby fast-food restaurant. He saw a group of five or six Black males there, including Joey Smith. Smith put his hand in his front waistband area. As Leon pulled out of the parking lot and looked back in his rearview mirror at the group, he saw Smith raise his shirt and display what appeared to be the grip of a handgun. After Leon reached home, he saw the group walking down the street toward his house. They tried to provoke him to come out to the street. As he started to walk inside, he saw two members of the group, Smith and "Sandman," shooting toward the house and aiming at him. ("Sandman," whose real name Leon did not know, was 16 or 17 years old, stood around five feet nine

2

inches tall, and weighed 160 pounds.)  A shot hit Leon's right big toe.  The group then ran off.  Leon claimed he did not fire any shots or even have a gun.

Sacramento Police Officer Mario Valenzuela testified that in the early morning of July 8, 2005, he obtained a statement from a suspect in the shooting, "Sandman" (defendant).

Defendant claimed that Leon and an associate of Leon's named Sir Byron had the habit of assaulting defendant when they crossed paths with him.  On July 7, as defendant walked with friends down Stoddard Street past Leon's house, Leon brandished a revolver at defendant and his group.

Defendant did not say what his friends did then.  He did say, however, that an older male acquaintance, whose name he did not know but whom he called an "OG," FN2 came by, put a handgun on the hood of a car, and said something like, "[I]f he [defendant] wanted to use it, he could, but he [the O.G.] wasn't going to hand it to him.  He [defendant] would have to pick it up himself."

[FN2:  As the People's gang expe[r]t testified at trial, "O.G." is a standard abbreviation for "original gangster," meaning a senior gang member who makes decisions for the gang and gives orders to junior members.  Defendant testified, however, that to him the term meant "old guy" (or "older adult male") and had nothing to do with gangs, though it might have done so in the past.]

According to defendant, Leon called Sir Byron, who came over.  Meanwhile, Leon brandished his weapon at defendant, his friends, and children in the vicinity.  Defendant heard Leon fire a shot.  In response, defendant picked up the gun from the car hood and fired several rounds toward Leon and Sir Byron.  He ran away, throwing the gun into someone's front yard along the way.  At the time of the shooting, he was not aware of anyone there (aside from himself and Leon) having a gun.

**Case No. 05F11333**

At the preliminary hearing, David Wong, who had accompanied the victim on the date of the crime, and Kalvin Williams, who had accompanied defendant, testified, as did Sacramento Police Detective Thomas Higgins. FN3  Wong and Williams portrayed the incident as a classic gang confrontation, but differed as to who started it.

[FN3:  Neither Wong nor Williams was available at trial. Their preliminary hearing testimony was read to the jury during the

People's case-in-chief. So far as the record shows, Williams was not related to defendant. Wong is Hispanic on his mother's side and identifies with that ethnicity for gang purposes.]

Wong testified:

Around noon on December 22, 2005, Wong was with Danny Valdez, his 17-year-old cousin, in the "Freeport" neighborhood of Sacramento. FN4  After leaving an acquaintance's house, where they had two or three beers apiece, they walked toward a park down the street.  Neither was under the influence of alcohol or drugs.  Neither had weapons.  Valdez was wearing a white T-shirt, a red hat, and blue jeans.

[FN4:  According to Detective Higgins, the neighborhood is called Freeport Manor.]

At the corner of 38th Avenue and McLaren Avenue, Wong and Valdez encountered defendant, whom Wong did not know but had seen in the neighborhood.  Defendant was standing in the middle of the street; a Black male unknown to Wong was walking behind defendant, at least 30 feet back.  Defendant was staring at Wong and Valdez and mumbling.  They crossed the street to find out what he wanted.

Defendant said:  "[Y]ou are in my hood" (or something similar).  He also told Wong:  "I know you, but I don't know your cousin."  Defendant pushed his fist into Valdez's chin.  Wong stepped between them and told defendant not to do that.  Raising his fist to Wong, defendant told him:  "[S]tay out of my area."

The man who had been walking behind defendant (i.e., Williams) came running up to the left of Wong.  Expecting Williams to hit him, Wong turned that way.  Defendant and Valdez then started fighting, with defendant's back toward Wong.  Wong could not see who threw the first punch.  When Wong turned back the other way, Williams hit him in the face.  Wong slipped and fell.  As he started to get up, he heard, but did not see, two shots fired.  Then he saw Valdez hit the ground.

Defendant was holding a smoking silver gun that looked like a .38 revolver, standing over Valdez and pointing the gun at him.  Defendant then put the gun in the front of his pants and ran off with Williams down McLaren Avenue.  Valdez subsequently died of his injury.

/////

4

Having been granted use immunity, Williams testified:

He was under 18 years old.   He had suffered a juvenile adjudication for theft.

He encountered defendant in the neighborhood on the morning of December 22, 2005.   They shared a 40-ounce beer at an acquaintance's house, but did not drink anything else or do any drugs.

After leaving, they walked to and from a Walgreen's on Freeport Boulevard, three or four blocks from the house.  Defendant walked ahead of Williams, who was text messaging as he walked.  When defendant reached the intersection of 38th Avenue and McLaren Avenue, Williams was in midblock, at least 30 feet behind.

Williams saw two Hispanic-looking strangers approaching defendant at the intersection, apparently trying to block defendant's path.  One said something like "[W]hatch [sic ] you looking at[?]"  The other was trying to hold him back from attacking defendant.  The first man (Valdez) was face-to-face with defendant; the second man (Wong) was face-to-face with Williams.  Defendant did not do or say anything challenging; he asked the strangers to go on and leave him alone.  Williams did not see any guns, but the strangers' outfits might have hidden weapons.

Valdez said something in Spanish about a gang.   Defendant replied, "[T]his Freeport."  Valdez "was just like ['']F[__] Freeport. Man, this is Norte['] and then just socked him." FN5

[FN5:  Williams claimed he had never heard the term "Freeport Crips."  He was not a member of that gang and did not know if defendant was.  He had heard that "Norte" is a gang.]

Wong hit Williams, who retaliated; Wong fell, then got up immediately and came at Williams again.  Williams could not see the fight between defendant and Valdez after the first punch.

As Wong came after Williams again, Williams heard one shot; he did not see who fired and did not know if anyone had been hit.  He ran to his grandmother's house a couple of blocks away; defendant caught up with him at the door.  Williams's sister opened the door to them.  Williams's mother, who lived nearby, came in, saying she had heard about the shooting.   Defendant and Williams claimed ignorance.

/////

5

Defendant got a ride from Williams's mother.  Williams did not go along.  He did not know where she was going to drop defendant off.

The police interviewed Williams about the shooting that evening. Confronted with the interview transcript during the preliminary hearing, Williams claimed he did not remember saying that "Sandman" told Williams, "I can't believe I just shot . . . this dude" and urged Williams not to tell anyone about it.  Williams also claimed he did not remember saying that Wong might have been trying to break up a fight between defendant and the victim, or that Williams heard two gunshots, or that he did not know defendant.

Detective Higgins testified:

Around 6:20 p.m. on December 22, 2005, Detective Higgins interviewed Earnest Ware about an incident that had occurred at approximately 2:45 p.m. outside the home of Ware's cousin on McLaren Avenue. FN6   While watching television there, Ware heard arguing outside and went to the front door, which was open behind a closed security door.

[FN6:  Ware testified at trial that the house actually belonged to his wife's cousin, who was not there that day.]

As Ware opened the security door and looked out, he saw someone falling and spinning backwards; then he saw another person pull a chrome or silver handgun out of his waistband and fire two shots at the first person.  The shooter was a light-skinned Black or mixed-race male, 5 feet 10 or 5 feet 11 inches tall, weighing 150 to 160 pounds, with bushy hair pulled back into a ponytail, wearing a dark sweater or jacket and blue jeans with white spots on them.

After the victim fell, the shooter's friend said, "[L]et's go."  They "trotted" past the house.  Ware called 911.

Detective Higgins showed Ware two photographic lineups, one including defendant, the other including Kalvin Williams.  Ware could not identify Williams, but said defendant looked like the shooter.

. . .

**Trial evidence**

We first recount the evidence pertaining specifically to each incident, then follow with the gang expert testimony.

6

**Counts one and two**

**Prosecution case**

Marlon Leon testified:

On July 7, 2005, he was 23 years old and on informal probation. FN8  He and defendant, whom he knew as "Sandman," were once friends, but had not been for some time before that date.  Leon had done nothing to create problems; people in the neighborhood just stopped getting along.

[FN8:  He did not specify the offense for which he was on probation at that time.]

In July 2005, Leon was staying in his grandmother's house on Stoddard Street with his girlfriend, Iris Luna.  Defendant had visited him there when they were still friends.

On the afternoon of July 7, 2005, Leon and Luna decided to go to A & W, a nearby fast-food restaurant.  Leon drove Luna's white rental car and she rode as a passenger.

At the A & W parking lot, Leon saw defendant's friend Joey Smith, with whom Leon had "problems."  Luna told Leon that Smith was reaching down as if to pull something out of his sock. Fearing trouble, Leon did not go into the restaurant.

Leon drove next door to the Airway Market, where he saw defendant with three to five friends.  Defendant and another man were running out of the store.  Leon saw one [member] of the group using a cell phone and another holding a gun.

Leon yelled something to them because he thought they were about to jump him.  Then he hopped back in the car and drove to his grandmother's house, "doing a hundred all the way[.]"  He owned a gun, but did not have it in the car.

Leon and Luna ran into the house.  Leon grabbed a cordless phone and called his best friend, Sir Byron (a person a little older than himself), who did not get along with defendant's group.  Leon wanted Sir Byron's help because defendant and his group had come running up there; there were "like 30 people in front of my house."  All the neighbors were also outside.

Leon went to the garage to get a .38 revolver, which he set down in the hallway by the front door.  Sir Byron was still on the phone, but never reached the scene.

7

Leon and Luna went outside to confront the crowd, which included defendant, Joey Smith, and Kalvin Williams; it also included a female who was calling out Luna to fight, egged on by the others. They were standing by the white rental car Leon had parked on the street.  Amending his prior testimony, Leon now recalled getting two guns from the garage, one of which (a .38 revolver) he was holding as he went outside; the other was for Luna, but he did not remember if she had picked it up or if it was still in the hallway.

Smith ran up onto the driveway.  Leon told him to get away before something happened.  Leon did not see Smith with a gun at any time during the incident.

A neighbor urged Leon to go inside.  As Leon tried to do so, shots were fired from defendant's position.  Leon saw defendant pull out a gun and shoot toward Leon and the house.  He did not see anyone else with a gun.

The last shot hit Leon in his big toe, breaking three bones.  It took him four to six months afterward to walk correctly.  He was still in pain.

After being shot, Leon walked inside, then came back out and fired one or two shots, aiming toward defendant.  The crowd took off running.

Leon was reluctant to testify because he still had "problems on the street" with defendant's friends.  Recently, defendant's brother had confronted him several times in the neighborhood, threatening to kill him one day.  Defendant had called him a snitch and thrown rocks at his car.

Leon admitted a felony conviction for assault with a deadly weapon in 2005. FN9  During his time on the stand, he was also shown to have made numerous prior inconsistent statements to the police and others.

[FN9:  He did not testify as to his sentence for this offense.]

Luna testified, telling roughly the same story Leon had told. FN10  Like him, she was impeached with prior inconsistent accounts.

[FN10:  Her account differed on three points: (1) she did not mention any challenge to her to come out and fight; (2) she saw Smith as well as defendant firing; and (3) she saw only one gun in the house, although Leon had tried to get her to testify that there were two.]

8

Officer Mario Valenzuela testified at trial, stating that the police had not found the gun defendant used.

Sacramento Police Officer Denise Wong testified that she found ten .40-caliber shell casings on the street outside the victim's house, and two spent bullet rounds, one on the street and one in the trunk of a parked white Hyundai; she also saw three bullet holes on the outside of the house. FN11  Inside the house, there was a spent bullet round close to the front door.  There was blood in the front doorway and on the front step.  In the driveway, there was a parked brown Chevrolet with body damage, leaking gasoline.

[FN11:  A firearms expert opined that all the shell casings came from a single .40-caliber weapon, while the spent bullets came either from a single .40-caliber weapon or from two similar ones. (He also opined that a .40-caliber weapon can fire smaller-caliber ammunition, but was not specifically asked about .38-caliber ammunition.)   A forensic investigator testified that the shell casings and bullet rounds did not produce latent prints.
Defendant and Leon were tested for gunshot residue, but the tests did not yield highly probative results.]

**Defense case**

The defense called police officers and the prosecutor's investigator to show Leon's and Luna's prior inconsistent statements.

Defendant testified on his own behalf as follows:

In July 2005 he was 16 years old.  He lived just outside the Freeport Manor neighborhood, but had lived in it for years, and his grandmother still did.   He knew gang members there and "associated" with them as an acquaintance, but was not in a gang. He had been called "Sandman," his present nickname, since he was little.

On July 7, 2005, defendant and a few friends, including Williams, were at the market when Leon drove up in a white car with Luna and yelled at them.  After words were exchanged, he drove off, saying, "I'll kill you."

Defendant and his friends walked toward the house of a friend's grandmother, a route which happened to take them past Leon's residence.   There were five or six in the group, including a 12-year-old.  Defendant did not have a gun.

As they passed Leon's residence, Leon was standing on the sidewalk; he threw his hands up as if to challenge them, then

9

walked away toward his parked Chevrolet in the driveway.  Two of defendant's friends started walking toward Leon, followed by defendant.  A few neighbors were outside.

Leon opened the driver's-side door of the Chevrolet and pulled out a revolver and a cell phone.  He walked up to his porch, where Luna was already standing.   As Leon and defendant's group argued, Leon waved the gun back and forth toward them.   More people from the neighborhood "just started popping up," including some defendant knew only by street name, such as "O.G.s and things like that."  Defendant went to the back of the rental car Leon had parked on the street.

Smith ran up onto Leon's lawn.  Leon pointed his gun at Smith and told him to back up; Smith returned to the street.  Someone threw a beer can at the porch.  Smith ran to the passenger side of the Chevrolet in the driveway and began to kick it, while Williams and his sister kicked the rental car in the street.  By now there were 20 to 25 people in front of the house, including children and neighbors.

Leon fired a shot at Smith.  Leon then got a bat and held it under his arm, still holding his gun in one hand and pointing it at the crowd as he talked on his cell phone.

As defendant stood by the rental car, "an O.G.-this dude who we-everybody in the neighborhood referred to as O.G.-old adult male" said he had a handgun that he would not give to defendant, but defendant could use it; "O.G." then put a semiautomatic on the car. "O.G." was Black and in his 40's, about defendant's height and weighing around 180 pounds, with braided hair; defendant had seen him more than 10 times in the neighborhood riding a bike, but did not know his name or where he lived.  After putting the gun down, "O.G." "took off." FN12

[FN12:  On cross-examination, defendant admitted that "O.G." at one time "[p]robably" meant "original gangster," but claimed that it no longer did. Since 2005 he had heard the term used only to mean "older people."]

Just then, Leon fired at defendant.  In a "quick reaction," defendant picked up the gun from the car and fired toward Leon until the gun ran out of ammunition.  He aimed not at Leon but "above him." He did not know whether any of his shots hit Leon.

The rest of the crowd started running when the shots began.  Once out of ammunition, defendant did the same.  As he ran, he threw the gun into someone's yard on McLaren Avenue.

10

**Count three**

**Prosecution case**

The jury heard the preliminary hearing testimony of Williams and David Wong, who were unavailable at trial.

Earnest Ware testified that while watching TV at his wife's cousin's house on McLaren Avenue on December 22, 2005, he heard noise outside.  As it continued, he opened the front security door and looked out.  He saw four males outside, two Hispanic and two Black (one of whom was "like albino kind of looking"), facing each other and arguing loudly.  (He could not identify anyone in the courtroom with certainty as one of the four; however, he saw one person who was light-complected, like one of those at the scene.)  He could not hear what they were arguing about.  He did not see any physical conflict.

One of the young Hispanic males stepped back; then two shots were fired and he went down.  The gunman put the weapon back into his pocket or his waist.

Ware went inside and called 911.  As he spoke on the phone, he heard one of the Black males holler, "[C]ome on, let's go," then saw them cross in front of the security door and run across the lawn.   The other Hispanic male was hollering, "Call an ambulance."

Ware was interviewed by Detective Higgins, who showed him a photo lineup in which he was able to identify the shooter.

Brian Bagerly, who lived in the area of the crime scene, heard the sound of a backfire on the afternoon of December 22, 2005, but did not think anything of it.  As he drove up to the scene, he saw one boy holding another, screaming, "[H]elp me.  My cousin's been shot."  Bagerly called 911 on his cell phone.  He did not see any guns or anyone leaving the scene.

Sacramento Police Officer Dustin Smith and other officers at the scene did not find any guns.  Receiving a report of suspects in a white Ford Explorer in the area of Zelda Way, Officer Smith found and detained a female Black adult and two other subjects.

Marian Vanhook, the mother of Williams, testified that on the afternoon of December 22, 2005, she picked up her daughter from school in her white Ford Explorer, then drove to her grandmother's house on Zelda Way to pick up her son.  As she neared her grandmother's house, she noticed that police officers had blocked

11

off a nearby street.  She asked a young man walking down the street what had happened and was told someone had been killed. When she arrived at her grandmother's house she was upset to find defendant there with her son because defendant had been having trouble with men in the neighborhood and she did not want Williams hanging out with him.  She asked if they knew about what had happened.  They said they did not.  She told Williams she was taking him home with her and asked defendant if she could drop him off somewhere because he could not stay there.  He said yes and directed her to an apartment complex near Florin Road and Greenhaven Drive where he said he was going to visit a friend; he got out there.  Williams was not with them because he had stayed behind to pack clothes. FN13 She did not see any guns on defendant.  After she dropped him off, she returned to the Zelda Way house, where the police contacted her; they searched the Explorer, but did not find any weapons.

[FN13:  Shown items of clothing in an exhibit, Vanhook identified a blue hat as her son's.]

Forensic pathologist Dr. Mark Super opined that Danny Valdez died of a single wound from a gunshot which entered at the neck, went through the right carotid artery, fractured the second vertebra in the neck, cut the spinal cord, causing an acute subarachnoid hemorrhage, then exited from the back of the neck.  Soot on Valdez's chin and around the wound showed that the shot had been fired from close range or a position possibly "loosely in contact" with the skin.  The trajectory of the bullet showed that it had moved slightly upward through the body. The evidence was consistent with Valdez taking a step backward while looking down to his right as the shot was fired. Valdez also had abrasions on his hands that could have come from a fistfight.

**Defense case**

Sacramento Police Officer David Topaz testified that when questioned at the scene, David Wong smelled heavily of beer.

Sacramento Police Officer Frank Woo testified that items of clothing seized at the scene included a red cap and a blue cap.  The blue cap said "Freeport" on the back and "Cali Kal" on the front. FN14

[FN14:  Kal is a short form of Williams's first name.]

Forensic laboratory analysts testified that blood samples from Valdez's autopsy showed cocaine metabolite in his system and a blood-alcohol content of .13 percent.  Based on the blood samples

and the preliminary hearing transcripts, a clinical neuropsychologist opined that the substances in Valdez's system on December 22, 2005, could have caused him to feel paranoid and to act aggressively and recklessly.

Defendant testified as follows:

He met Williams at someone's house in the neighborhood on the morning of December 22, 2005; then they went to another acquaintance's house and stayed a few hours, sharing a 40-ounce beer. After that, they walked out to do an errand, with Williams lagging behind because he was text messaging. Williams was still behind as they approached the corner of 38th Avenue and McLaren Avenue.

Defendant was dressed in a black coat, blue jeans, and a black knit cap; Williams was wearing dark clothes, including the blue cap introduced as an exhibit. FN15  Defendant did not have a gun.

[FN 15:  Defendant did not state what kind of hairstyle he was wearing that day.]

Two individuals approaching (Valdez and David Wong) caught defendant's attention because they were talking loudly and looking at him continuously. They crossed the intersection and cut him off, getting right in front of him. Valdez was wearing the red hat introduced as an exhibit and a big fluffy coat.

As they walked up to defendant, Valdez said: "What you are looking at?" (Sic.) Defendant said: "[W]hat do you mean what I'm looking at?" Valdez said: "[T]his is Norte." Defendant knew this referred to a Mexican gang called Norteños, but did not understand why Valdez was saying this to him; it made him mad and caused him to think the two of them were about to start something.

Defendant said: "[Y]ou're in my neighborhood. You're in Freeport." FN16  Valdez and David Wong spoke to each other in English; Wong said he knew defendant, but defendant did not remember ever seeing him. Because Valdez had gotten up in his face, defendant put his hands up and said, "[B]ack up out of my space"; he did not touch Valdez. Wong told defendant to get his hands out of Valdez's face. Defendant was mad, but did not lose his temper. By this time, Williams was reaching the scene.

[FN16:  On cross-examination, defendant denied that he was trying to "represent" (i.e., proclaim gang membership) as a Freeport Crip: "I was telling him where he was at." He assumed that when

13

Valdez said, "[T]his is Norte," he was referring to the neighborhood, not "representing" as a Norteño, because "I have family members who are northerners too." He thought that after they had exchanged information about the neighborhood, they would go about their business. However, when asked why he had answered Valdez by saying, "[Y]ou're in my neighborhood, this is Freeport," he replied: "I can't tell you why[.]"]

As defendant looked at Wong, Valdez punched him in the face. Defendant fell. From this point, he could not see what was going on between Williams and Wong.

Valdez bent over defendant, trying to get on top and continuing to swing. As defendant tried to get back up, he saw Valdez pull out a revolver and hold it in his hand.

Defendant grabbed for the gun, pushing up on Valdez's hand with both of his own. As they struggled for the gun, a single shot went off. Defendant did not know who pulled the trigger—"[i]t just happened too quick." Because defendant was pushing the gun up, the shot went away from him and toward Valdez. The impact separated them; defendant stepped back and Valdez fell backward. Valdez let go of the gun, but defendant's hand was still on it.

Defendant put the gun in his pocket and ran down McLaren Avenue, with Williams in front of him. They reached Williams's grandmother's house and went in.

Defendant said to Williams: "I think he got shot." Williams described his own fight and asked if defendant had seen it; defendant said "no." Williams asked if defendant had shot the victim; defendant said, "I just seen him fall." Defendant then told Williams not to talk about it because defendant was scared and did not know what might happen.

After Williams's mother arrived, she asked if defendant needed a ride; he said he did and directed her to a friend's residence at an apartment complex. He denied knowing about what had happened when asked by Williams's mother. They reached his destination in five or 10 minutes; she dropped him off and left. He threw the gun in a garbage bin at the complex.

The next day, defendant learned he was a suspect. After hiding out for two weeks because he was afraid, he turned himself in at his church.

/////

14

**Gang evidence**

Sacramento Police Detective Steven Hansen, an expert on Black gangs who had also been trained as to Hispanic gangs, explained that the main Black gangs in Sacramento are the Bloods and Crips. Crips identify with the color blue, Bloods with the color red.  If a Crip calls a fellow Crip "Cuz," it is a term of endearment, but if he calls a Blood "Cuz," it is a challenge or an act of aggression.  If a Blood walks through a Crip neighborhood wearing red, it is an act of aggression.  Freeport Manor is claimed by the Freeport Crips.

The main Hispanic gangs in Sacramento are the Norteños, who identify with the color red and the letter N, and the Sureños, who identify with the color blue.  "Norte," an abbreviation of Norteño, is sometimes yelled out by Norteño members.

The Sacramento Police Department confirms or validates a person as a gang member if he meets any two of 11 criteria, such as admission of gang membership, wearing of gang-related clothing, gang tattoos, and involvement in gang-related crimes.  Not all gang members have been confirmed; some "slip under the radar."

The highest-status Crips—"O.G.'s" or original gangsters—are the "shotcallers" or decision makers, while others are "soldiers" who must "put in work" for the gang to gain respect and climb the ladder.  Some O.G.'s started out with the gang in the early 1980's, but a younger person can also become an O.G.

Status, or "respect," is "of the utmost importance" to gang members, both within their gang and outside it.  It is gained by "intimidating and instilling fear within the community and rival gang members."  If a gang member is successfully challenged, or "disrespected," he will lose respect within his gang.  The ultimate means to gain status is murder.

A typical challenge is "if someone's throwing out [i.e., provocatively announcing] where they are from"—"letting this other person know, hey, you're not dealing with only me.  You're dealing with . . . all Crips."  Someone who enters a neighborhood claimed by a gang must receive its consent to conduct business there; denial of consent is a sign of disrespect.   If one is disrespected in front of witnesses, the word will spread quickly.

Gangs often seek to intimidate witnesses from testifying in court.  To be labeled a "snitch" is dishonorable in gang culture; it can also be fatal.  Someone who testifies against a gang member can have "problems on the street" afterward.

Detective Hansen had investigated defendant, including review of the preliminary hearing transcripts, classification reports from the juvenile hall probation department, and a similar report from the Sacramento Sheriff's Department.  In Detective Hansen's opinion, although the Sacramento Police Department has not confirmed defendant as a Crip, he is one.

Jail classification forms are used to make sure that inmates are not endangered by being housed with members of rival gangs.  An inmate gets to pick where he wants to be assigned.

The classification reports from the juvenile hall probation department, dated July 2005 and January 2006, showed that after defendant's interviews he was classified as a Crip member. FN17 An incident report from May 2006 described a fight with a fellow inmate who, according to defendant, was "disrespecting [defendant's] hood" and "told [defendant] that he was not a real Crip."  The sheriff's department classification report, dated February 2007, said:  "[S]eparate [defendant] from Bloods."  And on a classification form dated June 2007, defendant "basically admitted to being a Crip per him."

[FN17: Jennifer Yoshida, a Sacramento County juvenile probation officer, testified that defendant's classification forms showed him to be an "admitted Crip associate," which was not necessarily the same thing as a member. For classification purposes, the department did not care whether an inmate was an associate or a member because the need to separate him from inmates affiliated with rival gangs would be the same in either case.]

David Wong was confirmed as a Norteño in 2003 by the Sacramento Police Department.  A MySpace photograph of Danny Valdez shows him wearing a red hat bearing the letter N and a red sweater bearing the number 14 (both signifying Norteño affiliation), and (along with another person) holding up fingers indicating the same number.

The prosecutor gave Detective Hansen the following hypothetical:  Two persons, at least one of whom is associated with the Norteños, and one of whom is wearing a red hat that says "Sacramento," observe a Crip member and his friend, who is wearing a blue hat that says "Cali Kal"; a staring match or "mugging match" ensues; one group yells, "[W]hat are you looking at?"; the Crip says, "[Y]ou're in my hood. . . . [S]tay out of my area"; he adds, "This is Freeport"; one of the other individuals responds, "F[__] Freeport, man.  This is Norte"; a physical conflict ensues; finally, the Crip pulls out a gun and fatally shoots one of the opposing individuals. Based on these facts, Detective Hansen opined the incident was

16

gang-related: the wearers of opposing colors came in contact, leading to mutual statements of aggression or "disrespect," and deadly violence inevitably followed.

People v. Williams, No. C058205, 2010 WL 2224675, at *1-11 (Cal. Ct. App. June 4, 2010), also attached as Exhibit A to Respondent's Answer (ECF No. 23). The facts as set forth by the Court of Appeal are presumed correct, 28 U.S.C. § 2254(e)(1), and are consistent with the undersigned's review of the record.

II. Procedural Background

On January 14, 2008, following a consolidated trial, a jury in the Superior Court of Sacramento County ("Superior Court") found petitioner guilty of committing assault with a firearm (Cal. Pen. Code § 245(a)(2)) ("Count One"), discharging a firearm at an inhabited dwelling (Cal. Pen. Code § 246) ("Count Two"), and murder in the second degree (Cal. Pen. Code § 187(a)) ("Count Three"). (2CT at 314-17.[1]) The jury also found several special allegations to be true, including that petitioner personally used a firearm in the commission of Count One (Cal. Pen. Code § 12022.5(a)), that he proximately caused death or great bodily injury by personally and intentionally discharging a firearm in the commission of Counts Two and Three (Cal. Pen. Code § 12022.53(d)), and that he was free on bail during the commission of Count Three (Cal. Pen. Code § 12022.1). (Id.)

On February 15, 2008, the Superior Court sentenced petitioner to an aggregate term of seventy-two years to life in state prison. (2CT 385-88.) As to Count One, the court imposed a sentence to be served concurrently with Count Two. (Id.) As to Count Two, the court imposed a sentence of five years for the underlying offense and an additional twenty-five years-to-life for the firearm enhancement. (Id.) As to Count Three, the court imposed a consecutive sentence of fifteen years-to-life for the underlying offense, an additional twenty-five years-to-life for the

---

[1] Respondent lodged nineteen documents with the court ("Lod. Docs."). (See ECF No. 24.) "CT" refers to the Clerk's Transcript on Appeal, which was lodged in two volumes. (See Lod. Doc. 1.) "RT" refers to the Reporter's Transcripts, which respondent lodged in eight volumes. (Lod. Doc. 4.) "ART" refers to the Augmented Reporter's Transcripts, which was lodged in a single volume. (Lod. Doc. 5.)

17

1  firearm enhancement, and an additional two years for the out-on-bail enhancement. (<u>Id.</u>)

2       Petitioner appealed his conviction to the California Court of Appeal, Third Appellate

3  District ("Court of Appeal"). (Lod. Doc. 8.) His appeal consisted of two claims: the Superior

4  Court's refusal to sever the trial of Counts One and Two from the trial of Count Three denied

5  petitioner his rights to due process and a fair trial, and his sentence violated the Eighth

6  Amendment's prohibition against cruel and unusual punishments. (<u>Id.</u>) The Court of Appeal

7  rejected both claims and affirmed the judgment in a written opinion on June 4, 2010. (<u>Williams</u>,

8  2010 WL 2224675.)

9       Petitioner then filed a petition for review in the California Supreme Court. (Lod. Doc.

10  12.) His petition restated the same two claims that the Court of Appeal had rejected in its

11  affirmance of the judgment. (<u>Id.</u>) On August 11, 2010, the California Supreme Court denied the

12  petition for review without comment or citation. (Lod. Doc. 13.)

13       On August 10, 2011, petitioner filed a petition for a writ of habeas corpus in the Superior

14  Court. (Lod. Doc. 14.) That petition raised the arguments contained in Claims One through

15  Seven in the pending federal habeas petition. (<u>Id.</u>) On October 7, 2011, the Superior Court

16  issued an order denying the petition. (Lod. Doc. 15.) The Superior Court explained that Claims

17  One through Six were barred because petitioner could have raised them on direct appeal but failed

18  to do so. (<u>Id.</u>) The Superior Court denied Claim Seven on the merits. (<u>Id.</u>)

19       On October 31, 2011, petitioner filed a petition for a writ of habeas corpus in the Court of

20  Appeal. (Lod. Doc. 16.) That petition also raised the arguments contained in Claims One

21  through Seven in the pending federal habeas petition. (<u>Id.</u>) The petition indicated—incorrectly—

22  that petitioner had not "filed any other petitions, applications, or motions with respect to this

23  conviction, commitment, or issue in any court." (<u>Id.</u> at 4.) The Court of Appeal denied the

24  petition on November 4, 2011. (Lod. Doc. 17.) The single-sentence order denying the petition

25  cited just two cases: <u>In re Steele</u>, 32 Cal. 4th 682, 692 (2004), and <u>In re Hillery</u>, 202 Cal. App. 2d

26  293 (1962). (<u>Id.</u>)

27       On December 12, 2011, petitioner filed a petition for writ of habeas corpus in the

28  California Supreme Court. (Lod. Doc. 18.) That petition also raised the arguments contained in

1   Claims One through Seven in the pending federal habeas petition.  (Id.)  Petitioner again

2   incorrectly stated that he had not "filed any other petitions, applications, or motions with respect

3   to this conviction, commitment, or issue in any court."  (Id. at 4.)  The California Supreme Court

4   denied the petition without comment or citation on April 11, 2012.  (Lod. Doc. 19.)

5       On May 2, 2012, petitioner filed the pending federal habeas petition.  (Ptn.)  Respondent

6   filed an answer on February 19, 2013.  (ECF No 23.)  Petitioner filed a traverse on July 3, 2013.

7   (ECF No. 33.)

8   **STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA**

9       The statutory limitations of federal courts' power to issue habeas corpus relief for persons

10  in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

11  Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

12      An application for a writ of habeas corpus on behalf of a person in
        custody pursuant to the judgment of a state court shall not be
13      granted with respect to any claim that was adjudicated on the merits
        in State court proceedings unless the adjudication of the claim–
14

15      (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as
        determined by the Supreme Court of the United States; or
16

17      (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
        State court proceeding.
18

19      Section 2254(d) "does not require a state court to give reasons before its decision can be

20  deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, ___ U.S. ___, 131 S.

21  Ct. 770, 785 (2011).  Rather, "when a federal claim has been presented to a state court and the

22  state court has denied relief, it may be presumed that the state court adjudicated the claim on the

23  merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at

24  784-85.  But that presumption "may be overcome when there is reason to think some other

25  explanation for the state court's decision is more likely."  Id. at 785.  For example, "where . . . the

26  last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a

27  later decision did not silently disregard that bar and consider the merits."  Ylst v. Nunnemaker,

28  501 U.S. 797, 803 (1991).  "If the claim was not 'adjudicated on the merits' by the state court, the

1 review is to be de novo." Amado v. Gonzalez, ___ F.3d ____, 2014 WL 3377340, at *6 (9th Cir.

2 July, 11, 2014) (citing Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002)).

3      But when a claim has been "adjudicated on the merits," § 2254(d) makes clear that

4 AEDPA applies.  The Supreme Court has set forth the operative standard for federal habeas

5 review of state court decisions under AEDPA as follows:  "A state court's determination that a

6 claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

7 the correctness of the state court's decision." Harrington, 131 S. Ct. at 786 (quoting Yarborough

8 v. Alvarado, 541 U.S. 652, 664 (2004)).  Accordingly, "a habeas court must determine what

9 arguments or theories supported or . . . could have supported[] the state court's decision; and then

10 it must ask whether it is possible fairminded jurists could disagree that those arguments or

11 theories are inconsistent with the holding in a prior decision of [the Supreme] Court."

12 Harrington, 131 S. Ct. at 786.  "For purposes of § 2254(d)(1), 'an unreasonable application of

13 federal law is different from an incorrect application of federal law.'" Id. at 785 (quoting

14 Williams v. Taylor, 529 U.S. 362, 410 (2000)).  "Evaluating whether a rule application was

15 unreasonable requires considering the rule's specificity.  The more general the rule, the more

16 leeway courts have in reaching outcomes in case-by-case determinations.'" Harrington, 131 S.

17 Ct. at 786.  Emphasizing the stringency of this standard, which "stops short of imposing a

18 complete bar of federal court relitigation of claims already rejected in state court proceedings[,]"

19 the Supreme Court has cautioned that "even a strong case for relief does not mean the state

20 court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75

21 (2003)).

22      The undersigned also finds that the same deference is paid to the factual determinations of

23 state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

24 subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

25 decision that was based on an unreasonable determination of the facts in light of the evidence

26 presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

27 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1)—that is, the

28 factual error must be so apparent that "fairminded jurists" examining the same record could not

1  abide by the state court factual determination.  A petitioner must show clearly and convincingly

2  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

3        The habeas corpus petitioner bears the burden of demonstrating the objectively

4  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

5  Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

6  court's ruling on the claim being presented in federal court was so lacking in justification that

7  there was an error well understood and comprehended in existing law beyond any possibility for

8  fairminded disagreement."  Harrington, 131 S. Ct. at 786-87.  "Clearly established" law is law

9  that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten,

10  552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not qualify

11  as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not

12  permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

13  defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

14  qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

15  The established Supreme Court authority reviewed must be a pronouncement on constitutional

16  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

17  binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

18  **PETITIONER'S CLAIMS**

19        Petitioner's federal habeas petition raises nine claims:  (1) "the trial court erred when it

20  failed to suppress extra-judicial statements made to police officer Valenzuela;" (2) petitioner was

21  denied due process and a fair trial because neither the prosecutor nor the Superior Court granted

22  David Wong immunity; (3) the inconsistent jury verdicts necessitated a new trial; (4) the evidence

23  is insufficient to sustain petitioner's second-degree murder conviction; (5) the sentence

24  enhancement imposed pursuant to California Penal Code[2] section 12022.53(d) is invalid because

25  the prosecution failed to prove subdivision (e)(1) of that statute; (6) the sentencing judge

26  incorrectly believed that Penal Code section 12022.1 required imposition of consecutive life

27

28  [2]  All subsequent references to "Penal Code" are to the California Penal Code.

1    terms; (7) petitioner received ineffective assistance of appellate counsel; (8) a single trial joining

2    Counts One and Two with Count Three denied petitioner due process and a fair trial; and (9)

3    petitioner's sentence of seventy-two years-to-life violates the Eighth Amendment's prohibition on

4    cruel and unusual punishments.  (Ptn. 7-8.[3])

5                                    **PROCEDURAL ISSUES**

6    I.  Fair Presentation of Claims

7             A state prisoner must exhaust available state court remedies before a federal court may

8    consider granting habeas corpus relief.  See 28 U.S.C. § 2254(b)(1)(A); O'Sullivan v. Boerckel,

9    526 U.S. 838, 842 (1999).  But see 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas

10   corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the

11   remedies available in the courts of the State.").  To satisfy the exhaustion requirement, a

12   petitioner must "fairly present" his federal claims to the state courts.  Duncan v. Henry, 513 U.S.

13   364, 365 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)) (internal quotation marks

14   omitted).

15            Respondent argues that petitioner "did not fairly present [Claims] One through Seven to

16   the Court of Appeal or the California Supreme Court because he misrepresented to both courts

17   that he had not previously sought relief from a lower court."  (ECF No. 23 at 26.)  Respondent

18   does not provide any citation in support of this argument, which clearly fails under the United

19   States Supreme Court's standard for fair presentation.  "A claim has been 'fairly presented' if the

20   petitioner has described both the operative facts and the federal legal theory on which his claim is

21   based."  Baldwin v. Reese, 541 U.S. 27, 33 (2004).

22            Here, despite misrepresenting that he had not previously sought relief from a lower court,

23   petitioner's habeas petitions to the state appellate courts—each of which totaled thirty-nine

24   pages—explicitly described both the operative facts and the federal legal theories on which his

25   claims were based.  (See Lod. Docs. 16 and 18.)  The petitions therefore fairly presented his

26   claims in Claims One through Seven to the state appellate courts, and petitioner has satisfied the

27   _____

28   [3]  Page number citations are to the pagination assigned via the court's electronic filing system.

1    exhaustion requirement.

2    II.  Standard of Review

3         A.  Claims One through Six

4         No state court has adjudicated Claims One through Six on the merits.  As noted above,

5    there is a presumption that a state court has adjudicated a claim on the merits when the claim has

6    been presented to the court and the court has denied relief.  See Harrington, 131 S. Ct. at 784-85.

7    Here, petitioner presented Claims One through Six to the Superior Court, the Court of Appeal,

8    and the California Supreme Court in his habeas petitions, and each of those courts denied relief.

9    Thus, the presumption is applicable to Claims One through Six.

10        But Harrington makes clear that the presumption "may be overcome when there is reason

11   to think some other explanation for the state court's decision is more likely."  Id. at 785 (citing

12   Ylst, 501 U.S. at  803).  Here, the presumption is overcome because there is reason to think that

13   the state courts more likely denied the petitions—at least with respect to Claims One through

14   Six—on state procedural grounds than on the merits.  See Lambert v. Blodgett, 393 F.3d 943, 969

15   (9th Cir. 2004) (explaining that an adjudication on the merits is a "decision finally resolving the

16   parties' claims . . . that is based on the substance of the claim advanced, rather than on a

17   procedural, or other, ground." (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)).

18        The Superior Court explicitly denied Claims One through Six on state procedural grounds.

19   (See Lod. Doc. 15 (explaining that those claims were barred under In re Harris, 5 Cal. 4th 813,

20   829, 21 Cal. Rptr. 2d 373 (1993), because they were part of the record and could have been raised

21   on direct appeal)).  The Court of Appeal—albeit for a different reason—also did not reach the

22   merits of Claims One through Six.  (See Lod. Doc. 17.)  The Court of Appeal's order cites just

23   two cases, both of which permit a court to deny a habeas corpus petition without reaching the

24   merits.  See In re Steele, 32 Cal. 4th 682, 692, 10 Cal. Rptr. 3d 536 (2004) ("a reviewing court

25   has discretion to deny without prejudice a habeas corpus petition that was not filed first in a

26   proper lower court"); In re Hillery, 202 Cal. App. 2d 293, 294, 20 Cal. Rptr. 759 (1962) ("[T]his

27   court has discretion to refuse to issue the writ . . . on the ground that application has not been

28   made therefor in a lower court in the first instance.")

1        There is also reason to think that the California Supreme Court did not deny petitioner's

2   claims on the merits.  First, in his petition to the California Supreme Court, petitioner

3   misrepresented that he had not filed any petitions related to his conviction in any other court.  The

4   California Supreme Court may have, like the Court of Appeal, exercised its discretion under In re

5   Steele and In re Hillery and dismissed on procedural grounds without reaching the merits.

6   Second, because the last reasoned opinion addressing Claims One through Six (the Superior

7   Court's order) explicitly found that those claims were procedurally barred, there is a presumption

8   that the California Supreme Court did not silently disregard that bar and consider the merits.  See

9   Ylst, 501 U.S. at 803 ("where . . . the last reasoned opinion on the claim explicitly imposes a

10  procedural default, we will presume that a later decision did not silently disregard that bar and

11  consider the merits"); Cannedy v. Adams, 706 F.3d 1148, 1159 (9th Cir. 2013) ("[Harrington]

12  does not change our practice of 'looking through' summary denials to the last reasoned

13  decision—whether those denials are on the merits of discretionary review."), as amended, 733

14  F.3d 794 (9th Cir. 2013), cert. denied, 134 S. Ct. 1001 (2014); see also Johnson v. Williams, ___

15  U.S. ____, 133 S. Ct. 1088, 1094 n.1 (2013) ("Consistent with our decision in Ylst, the Ninth

16  Circuit 'look [ed] through' the California Supreme Court's summary denial of Williams' petition

17  for review and examined the California Court of Appeal's opinion, the last reasoned state-court

18  decision to address Juror 6's dismissal.").  There is no indication that the California Supreme

19  Court's unexplained order, which upheld the Superior Court's rejection of Claims One through

20  Six, rested upon a different ground than the procedural bar cited by the Superior Court.  See Ylst,

21  501 U.S. at 80 ("Where there has been one reasoned state judgment rejecting a federal claim, later

22  unexplained orders upholding that judgment or rejecting the same claim rest upon the same

23  ground.").  The California Supreme Court's summary denial, like the Superior Court and Court of

24  Appeal orders, is therefore not on the merits.

25        Thus, the presumption of adjudication on the merits is "overcome."  As the Ninth Circuit

26  recently reconfirmed, "[i]f the claim was not 'adjudicated on the merits' by the state court, the

27  review is to be de novo."  Amado v. Gonzalez, ___ F.3d ____, 2014 WL 3377340, at *6 (9th Cir.

28  July, 11, 2014) (citing Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002)).  Because no state

24

1   court adjudicated Claims One through Six on the merits, this court reviews them de novo.

2       B.  <u>Claims Seven through Nine</u>

3       Petitioner included Claim Seven in each of his state habeas petitions.  Because the

4   California Supreme Court summarily denied the petition, this court must look through that

5   judgment to the last reasoned-state court decision on the merits.  <u>Cannedy</u>, 706 F.3d at 1159.  The

6   Superior Court order is the only reasoned-state court decision addressing Claim Seven on the

7   merits.  Accordingly, this court looks through to and reviews the Superior Court's analysis of

8   Claim Seven under § 2254(d).

9       Section 2254(d) review is also appropriate for Claims Eight and Nine.  Petitioner raised

10  those claims in his direct appeal and the Court of Appeal addressed them in a reasoned decision.

11  <u>See</u> <u>Williams</u>, 2010 WL 2224675.  Thus, this court reviews the Court of Appeal's analysis of

12  Claims Eight and Nine under § 2254(d).

13                      **<u>DISCUSSION</u>**

14  I.  <u>Claim One:  Petitioner's Statements to Officer Valenzuela</u>

15      Petitioner claims that "the trial court erred when it failed to suppress extra-judicial

16  statements made to police officer Valenzuela."  (Ptn. 14.)  In support of his claim, petitioner

17  contends:  (1) he did not expressly waive his <u>Miranda</u> rights in writing before making the

18  statements, (2) the statements were involuntary, (3) the trial court failed to consider the totality of

19  the circumstances to determine if the statements were voluntary, (4) Officer Valenzuela

20  committed perjury at the preliminary hearing, and (5) Officer Valenzuela admitted to having

21  elicited inculpatory identification information before informing petitioner of his <u>Miranda</u> rights.

22  (Ptn. 14-17.)

23      A.  <u>Background</u>

24      Officer Valenzuela testified at the suppression hearing that he obtained petitioner's

25  telephone number from petitioner's mother the morning after the shooting.[4]  (ART 3-5.)  Officer

26  Valenzuela then called petitioner and told him that he needed petitioner to sign an agreement

27  _____

28  [4]  Petitioner suggests that his mother provided Officer Valenzuela petitioner's phone number
because Officer Valenzuela misrepresented his rank by claiming to be a sergeant.  (Ptn. 15.)

stating that petitioner and Leon would leave each other alone.  (ART 5-6, 34.)  This "ruse" was effective:  as petitioner approached his mother's apartment to sign the waiver, officers detained and placed petitioner in the back seat of a patrol car.  (ART 6-8, 34.)  In the patrol car Officer Valenzuela asked petitioner—before advising him of his <u>Miranda</u> rights—questions about his identity, including questions about the moniker "Sandman."  (ART 8.)  Officer Valenzuela advised petitioner of his <u>Miranda</u> rights as follows:

> You have the right to remain silent.
>
> Do you understand?
>
> Anything you say may be used against you in court.
>
> Do you understand?
>
> You have the right to the presence of an attorney before and during any questioning.
>
> Do you understand?
>
> If you cannot afford an attorney, one will be appointed for—free of charge before any questioning if you want.
>
> Do you understand?

(ART 9-10.)  According to Officer Valenzuela, petitioner "stated that he understood each and every one" of those rights.  (ART 10.)  Petitioner appeared to understand and did not ask any questions about his rights.  (<u>Id.</u>)

Officer Valenzuela, without asking if petitioner wished to waive his <u>Miranda</u> rights, began asking petitioner questions about the incident.  (ART 10, 13)  Petitioner willingly answered the questions without reluctance; he appeared awake, calm, quiet, and unemotional, and he did not display any indications of illness or intoxication.  (ART 11-12.)  Petitioner then provided a statement in which he admitted firing several shots at Leon.  (2RT 427-28.)

The trial court denied petitioner's motion to suppress his statement to Officer Valenzuela upon finding that petitioner had waived his <u>Miranda</u> rights.

/////

1
2

> The question here is not whether [petitioner] was advised of his rights because the court finds that he was. The question is whether he waived those rights before the interrogation took place.

3
4
5

> There's no doubt from the evidence here that there's no express waiver of the rights summarized. He did not specifically say nor was he specifically asked if he waived his constitutional rights.

6

> . . .

7
8
9
10
11

> The evidence is that he was in custody at the time that he was <u>Mirandized</u> approximately ten minutes after he was placed in the patrol unit. He appeared to understand what was being said to him. He did not ask any questions about his rights. He didn't appear confused. He said he understood. There was nothing coercive about this situation other than the usual stress of being taken into custody and handcuffed and being transported. He did not appear to be reluctant to answer at all.

12
13

> Based on the totality of the circumstances it does not appear to this court that [petitioner's] statement was the product of coercion or a[n] involuntary waiver of his constitutional rights.

14
15

> It does appear that there was an implied waiver here and that it was free and voluntary.

16    (RAT 47, 49-50.)

17        Similarly, in denying petitioner's habeas petition, the Superior Court addressed the

18    argument that the failure to challenge the admissibility of petitioner's statements to Officer

19    Valenzuela amounted to ineffective assistance of appellate counsel:

20
21
22
23
24
25
26
27

> As to the first issue, whether counsel should have argued that petitioner's <u>Miranda</u> rights had been violated, "[i]n reviewing <u>Miranda</u> issues on appeal, [an appellate court] accept[s] the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine[s] from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." A <u>Miranda</u> warning is adequate even when there is no express waiver of rights. (<u>Berguis v. Thompkins</u> (2010) ___ U.S. ___, 130 S.Ct. 2250, 2261.) Waiver may be implied when, after having received a proper warning, a defendant submits to questioning. There is no requirement that police obtain a parent's consent before interrogating a minor.

28    /////

1
2
3
4
5
6
7
8

> In evaluating whether to challenge the Miranda warning petitioner received, counsel would have recognized that the appellate court would not redetermine credibility.  It would not decide that the officer was untruthful when the court and jury had found otherwise.  Thus, the evidence showed that a Miranda warning was given.  There was no requirement that petitioner expressly waive his rights.  And there was no requirement as to parental consent. Counsel would also recognize that petitioner could not testify as to the conversation between the officer and his mother because petitioner was not present.  His testimony would be hearsay.  Thus, counsel had no ground for a Miranda challenge and was not ineffective in omitting this challenge from the appeal.

9  (Lod. Doc. 15 at 2 (some citations omitted).)

10      B.  Waiver

11          1.  Standard

12      In Miranda, the United States Supreme Court held that "the prosecution may not use

13  statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

14  defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege

15  against self-incrimination."  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  To this end,

16  custodial interrogation must be preceded by advice to the potential defendant that he or she has

17  the right to consult with a lawyer, the right to remain silent, and that anything stated can be used

18  in evidence against him or her.  Id. at 473-74.

19      But a defendant may waive his Miranda rights, and such a waiver need not be express.

20  Berghuis v. Thompkins, 560 U.S. 370, 384 (2010) ("An 'implicit waiver' of the 'right to remain

21  silent' is sufficient to admit a suspect's statement into evidence." (quoting North Carolina v.

22  Butler, 441 U.S. 369, 376 (1979)).  "[W]aiver of Miranda rights may be implied through 'the

23  defendant's silence, coupled with an understanding of his rights and a course of conduct

24  indicating waiver.'"  Thompkins, 560 U.S. at 384 (quoting Butler, 441 U.S. at 373).  Stated

25  differently:  "Where the prosecution shows that a Miranda warning was given and that it was

26  understood by the accused, an accused's uncoerced statement establishes an implied waiver of the

27  right to remain silent."  Thompkins, 560 U.S. at 384; see also Hurd v. Terhune, 619 F.3d 1080,

28  1088 (9th Cir. 2010) ("Thompkins makes clear that a criminal defendant must affirmatively and

1   unambiguously invoke his right to remain silent if he wishes to cut off police interrogation.").

2   Thus, "[t]he waiver inquiry has two distinct dimensions:  waiver must be voluntary in the

3   sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or

4   deception, and made with a full awareness of both the nature of the right being abandoned and the

5   consequences of the decision to abandon it." Thompkins, 560 U.S. at 382 (internal quotation

6   marks omitted); see also Moran v. Burbine, 475 U.S. 412, 421 (1986).  The Supreme Court

7   employs a totality-of-the-circumstances approach to determine whether a defendant has waived

8   his Miranda rights, "even where interrogation of juveniles is involved." Fare v. Michael C., 442

9   U.S. 707, 725 (1979).  This approach requires inquiry into all the circumstances surrounding the

10  interrogation, including evaluation of "the juvenile's age, experience, education, background, and

11  intelligence, and into whether he has the capacity to understand the warnings given him, the

12  nature of his Fifth Amendment rights, and the consequences of waiving those rights." Id.

13          2.  Analysis

14  Petitioner contends that the trial court should have suppressed his statement to Officer

15  Valenzuela because petitioner did not provide "expressed written" waiver of his Miranda rights.

16  (Ptn. 15.)  He also suggests that any implied waiver of his Miranda rights was invalid because (1)

17  Officer Valenzuela misrepresented his rank to petitioner's mother and used a ruse to trick

18  petitioner into detention and arrest, and (2) petitioner was "a naïve sixteen year old unfamiliar

19  with the criminal justice system and uneducated to his right to remain silent during his custodial

20  questioning,"[5]  (Ptn. 15-17.)

---

21  [5]  Petitioner also contends that Officer Valenzuela's failure to notify petitioner's parents of
22  petitioner's Miranda rights requires suppression of the inculpatory statements.  (Ptn. 15.) See
    United States v. Doe, 170 F.3d 1162, 1168 (9th Cir. 1999) (explaining that although such a failure
23  "is not a due process violation, it may serve as an independent basis for suppression.").
    Petitioner's contention is not relevant to the waiver inquiry under Thompkins, and, in any event,
24  does not warrant habeas relief.  Petitioner fails to recognize that Doe is of no consequence or
    relevance to his conviction. See Doe, 170 F.3d at 1167 (holding that "[18 U.S.C.] § 5033 requires
25  the government to inform [a] juvenile's parents of the juvenile's Miranda rights") (emphasis
    added). Doe concerned a federal statute, not the United States Constitution.  Moreover, that
26  federal law is irrelevant to petitioner's conviction.  Section 5033 is part of the Federal Juvenile
    Delinquency Act, which applies only to "violations of a law of the United States committed by a
27  person prior to his eighteenth birthday . . . ." 18 U.S.C. § 5031 (emphasis added).  Section 5033
    and Doe are inapplicable because petitioner was charged, tried, and convicted of violations of
28

1       Petitioner's emphasis on "expressed written" waiver suggests he does not understand what

2  Thompkins makes clear:  an individual may waive his or her Miranda rights implicitly.

3  Thompkins, 560 U.S. at 384.  The trial court judge explained this point of law when denying

4  petitioner's motion to suppress, (ART 50), as did the Superior Court judge when denying

5  petitioner's state habeas petition, (Lod. Doc. 15 at 2).  Application of Thompkins leads the

6  undersigned to the same conclusion that the two state court judges explicitly arrived at:  petitioner

7  implicitly waived his rights.

8       The totality of the circumstances indicates that petitioner's statement to Officer

9  Valenzuela was the product of a free and deliberate choice rather than intimidation, coercion, or

10  deception.   Petitioner fails to explain how his consumption of alcohol before his arrest rendered

11  his waiver involuntary.  Moreover, his emphasis on Officer Valenzuela's alleged

12  misrepresentation of rank to petitioner's mother and the "ruse" that led to petitioner's arrest is of

13  no relevance to the waiver inquiry.  The alleged misrepresentation of rank—a misrepresentation

14  made not to petitioner but to his mother—is irrelevant because it occurred outside the presence of

15  petitioner and he had no knowledge of it.  See Moran v. Burbine, 475 U.S. 412, 422 (1986)

16  ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can

17  have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right.").

18  Similarly, petitioner fails to explain how the ruse—the falseness of which petitioner must have

19  recognized when handcuffed and placed in the back of a patrol car upon arriving at his mother's

20  apartment—affected his decision to waive his Miranda rights.  The ruse resulted in nothing more

21  than petitioner's arrest; it did not compel or coerce him to confess.  See Illinois v. Perkins, 496

22  U.S. 292, 297 (1990) ("Ploys to mislead a suspect or lull him into a false sense of security that do

23  not rise to the level of compulsion or coercion to speak are not within Miranda's concerns.").  As

24  _____

25  state law, not federal law.  Habeas relief is therefore not warranted on the ground that Officer
   Valenzuela failed to notify petitioner's parents of petitioner's Miranda rights.  See Burunda v.

26  Williams, 2:08-cv-015633-JCM-PAL, 2012 WL 474503, at *4 (D. Nev. Feb. 14, 2012) ("[Cases
   that the petitioner relied on his habeas petition] concern application of the Federal Juvenile

27  Delinquency Act in federal criminal proceedings.  Petitioner was convicted in Nevada state court
   under Nevada state law.  Federal decisions regarding the application of a federal statute in a

28  federal criminal trial are irrelevant.").

1  the trial court judge observed:  "There was nothing coercive about this situation other than the

2  usual stress of being taken into custody and handcuffed and being transported.  He did not appear

3  to be reluctant to answer at all."  (ART 49.)  In sum, the totality of the circumstances indicates

4  that petitioner's statement to Officer Valenzuela was the product of a free and deliberate choice

5  and not intimidation, coercion, or deception.

6         The totality of the circumstances also indicates that petitioner understood his Miranda

7  rights when he made the statements to Officer Valenzuela.  Petitioner now emphasizes that he

8  was "a naïve sixteen year old unfamiliar with the criminal justice system and uneducated to his

9  right to remain silent during his custodial questioning."  (Ptn. 15.)  But Miranda does not require

10 any familiarity with the criminal justice system beyond a reading of the warnings—which

11 petitioner admits he received.  While petitioner now claims he was "uneducated to his right to

12 remain silent," Officer Valenzuela explicitly informed him of that right; according to Officer

13 Valenzuela, petitioner stated that he understood that and the other Miranda rights.  As the trial

14 court judge explained:  "[Petitioner] appeared to understand what was being said to him.  He did

15 not ask any questions about his rights.  He didn't appear confused.  He said he understood."

16 (ART 49.)  The undersigned also finds that those facts indicate petitioner understood his rights.

17 Thus, while petitioner's age and naiveté are relevant to the waiver inquiry, the totality of the

18 circumstances indicates that petitioner understood his Miranda rights.

19        The totality of the circumstances indicate that Officer Valenzuela informed petitioner of

20 his Miranda rights, that petitioner understood those rights, that petitioner's statement was not

21 coerced, and that petitioner therefore implicitly waived his rights.  See Thompkins, 560 U.S. at

22 385 (finding waiver where there was no basis to conclude that the defendant did not understand

23 his rights and that "he chose not to invoke or rely on those rights when he did speak").

24        B.  Involuntary Statements

25              1. Standard

26        "A confession must be suppressed, even absent a Miranda violation, if the totality of the

27 circumstances demonstrates that the confession was involuntary."  DeWeaver v. Runnels, 556

28 F.3d 995, 1002-03 (9th Cir. 2009).  However, the Ninth Circuit has observed that a defendant's

1    statement was "likely voluntary" if obtained after <u>Miranda</u> warnings and a valid waiver.  <u>Id.</u> at

2    1003; <u>see also</u> <u>Missouri v. Seibert</u>, 542 U.S. 600, 608-09 (2004) ("[G]iving the warnings and

3    getting a waiver has generally produced a virtual ticket of admissibility.").  In determining

4    whether a statement or confession was involuntary and obtained in violation of the principles of

5    due process of law protected by the Fifth and Fourteenth Amendments, a court examines whether

6    a defendant's will was overborne by the circumstances surrounding the giving of the statement or

7    confession.  <u>Dickerson v. United States</u>, 530 U.S. 428, 434 (2000); <u>see also</u> <u>Doody v. Ryan</u>, 649

8    F.3d 986, 1014 (9th Cir. 2011) (en banc) (applying <u>Dickerson</u>).  A court considers the totality of

9    all the surrounding circumstances, including the characteristics of the accused and the details of

10   the interrogation.  <u>Dickerson</u>, 530 U.S. at 434.

11            2. <u>Analysis</u>

12        Officer Valenzuela informed petitioner of his <u>Miranda</u> rights and petitioner provided a

13   valid waiver of those rights.  Based on these facts alone, petitioner's statements to Officer

14   Valenzuela were "likely voluntary."  <u>See</u> <u>DeWeaver</u>, 556 F.3d at 1003.

15        Petitioner's argument that the statements were involuntary rests on the same factual basis

16   as his argument that his waiver was involuntary:  (1) Officer Valenzuela misrepresented his rank

17   to petitioner's mother and used a ruse to trick petitioner into detention and arrest, (2) petitioner

18   was "a naïve sixteen year old unfamiliar with the criminal justice system and uneducated to his

19   right to remain silent during his custodial questioning," and (3) Officer Valenzuela made no

20   attempt to notify petitioner's parents of petitioner's <u>Miranda</u> rights.  Such facts, just as in the

21   <u>Miranda</u> waiver analysis, do not establish involuntariness.

22        Officer Valenzuela's alleged misrepresentation of rank—made outside of petitioner's

23   presence and before the questioning took place—could not possibly have affected petitioner's

24   decision to provide the statements.  Similarly, the ruse had concluded with petitioner's arrest and

25   thus was not a circumstance surrounding "the giving of the statement."  <u>Dickerson</u>, 530 U.S. 434.

26   Officer Valenzuela's failure to inform petitioner's parents of petitioner's rights under <u>Miranda</u> is

27   also irrelevant to determining whether petitioner's will was "overborne by the circumstances."

28   <u>Id.</u>  Petitioner's age and education, however, are certainly relevant to inquiry.  But that does not

1   mean that petitioner was incapable of voluntarily providing statements to law enforcement.  There

2   is simply no indication that Officer Valenzuela or any other law enforcement officer coerced or

3   placed even slight pressure on petitioner.  As the trial court judge noted:  "There was nothing

4   coercive about this situation other than the usual stress of being taken into custody and

5   handcuffed and being transported.  He did not appear to be reluctant to answer at all."  (ART 49.)

6          Thus, petitioner's claim that his statement was involuntary does not warrant habeas relief.

7          C.   The Trial Court's Evaluation of Voluntariness

8          Petitioner contends that the trial court judge failed to "look at the totality of the

9   circumstances" in determining whether his statements to Officer Valenzuela were voluntary.

10  (Ptn. 15.)  But the trial court judge explicitly found "[b]ased on the totality of the circumstances it

11  does not appear to this court that [petitioner's] statement was the product of coercion or a[n]

12  involuntary waiver of his constitutional rights."  (ART 50 (emphasis added).)   The analysis

13  preceding that conclusion indicates that the trial court did in fact base the ruling on the totality of

14  the circumstances.  Accordingly, petitioner's claim that the trial court judge failed to consider the

15  totality of the circumstances in determining whether petitioner's statements to Officer Valenzuela

16  were voluntary does not warrant habeas relief.

17          D.   Officer Valenzuela's Purported Perjury

18          Petitioner contends that Officer Valenzuela committed perjury by providing inconsistent

19  testimony.  (Ptn. 15-16.)  Specifically, petitioner contends that Officer Valenzuela's preliminary

20  hearing testimony—in which he stated that petitioner was reluctant to make potential inculpatory

21  statements—conflicts with his testimony at a later hearing in which denied any reluctance.  (Ptn.

22  15-17.)  Petitioner argues that the trial court failed to consider his reluctant behavior or the

23  discrepancy in Officer Valenzuela's purportedly perjured testimony when denying the motion to

24  suppress.  (Ptn. 15-16.)

25          But there is no inconsistency in Officer Valenzuela's testimony.  Officer Valenzuela

26  testified at the preliminary hearing:

27                  Q:  Did you speak to [petitioner] about a shooting that occurred at
                    1448 Stoddard Street?
28

33

A:  Yes, I did.

Q:  Before speaking to him about that, did you ask [petitioner] if he had a nickname or moniker he went by?

A:  Yes, I did.

Q:  Did [petitioner] respond?

A:  Initially, he was reluctant, but he did state that his nickname was Sandman.

(1CT 69.)  At the subsequent suppression hearing, Officer Valenzuela was twice asked if petitioner was reluctant to answer questions about "the incident." (ART 10-11 (emphasis added).)  Officer Valenzuela replied that petitioner was not reluctant and willingly answered such questions.  (Id.)  Officer Valenzuela's statement at the preliminary hearing—that petitioner was initially reluctant to reveal his nickname—is not inconsistent with his statement at the suppression hearing—that petitioner was not reluctant in answering questions about "the incident." Petitioner's nickname is a separate topic distinct from his shooting at Leon.  Because Officer Valenzuela did not provide inconsistent testimony, each of petitioner's arguments resting on the alleged inconsistency necessarily fail and do not warrant habeas relief.

E.  Identification Information

Petitioner argues that Officer Valenzuela "admit[ted] to having elicited [] inculpatory identification information before Mirandizing [] petitioner . . . ." (Ptn. 16.)  Officer Valenzuela did in fact testify that he asked petitioner about his nickname before reading petitioner his Miranda rights.  (ART 38-39.)  However, Ninth Circuit precedent makes clear that Officer Valenzuela's question about petitioner's moniker did not violate Miranda.  See United States v. Washington, 462 F.3d 1124, 1133 (9th Cir. 2006).

In Washington, FBI agents asked the defendant "a series of background questions"— including questions about his gang moniker and gang affiliation—before reading him his Miranda rights. Id. at 1129.  On appeal, the defendant argued that the question about his gang moniker amounted to an interrogation, and thus required Miranda warnings.  The Ninth Circuit first stated

34

1   the general rule: "routine gathering of background biographical information, such as identity,

2   age, and address, usually does not constitute interrogation." Id. at 1132. The Ninth Circuit then

3   reasoned that because police routinely ask suspects their names after being told that the person is

4   a suspect, "the question about [the defendant's] gang moniker was routine gathering of

5   background information, not interrogation." Id. at 1133. The defendant's statement about his

6   gang moniker—despite preceding the Miranda warnings—was therefore admissible.[6]

7          Under Washington, Officer Valenzuela's question about petitioner's "Sandman" moniker

8   was simply "routine gathering of background information, not interrogation." Petitioner's

9   inculpatory response—despite preceding the Miranda warnings—was therefore admissible. His

10  claim does not warrant habeas relief.

11         F. Conclusion on Claim One

12         None of petitioner's Miranda claims warrant habeas relief.

13  II. Claim Two: Wong's Immunity

14         Petitioner contends that he was denied due process and a fair trial because neither the

15  prosecutor nor the court granted David Wong immunity. (Ptn. 20.) In support of his argument,

16  petitioner contends: (1) Wong "wasn't under [the] threat of self-incrimination"; (2) the

17  prosecutor failed to disclose to the jury that, unlike Wong, Kalvin Williams had received use

18  immunity for his testimony at the preliminary hearing; (3) the trial court erred in admitting the

19  transcript of Wong's testimony from the preliminary hearing; and (4) petitioner presented good

20  cause for continuing the jury trial until after Wong's sentencing in an unrelated criminal case.

21  (Ptn. 20-24.)

22         A. Background

23         Wong testified at petitioner's preliminary hearing but invoked his Fifth Amendment right

24  to be free from self-incrimination and refused to answer any questions when called at petitioner's

25  _____

26  [6] The defendant in Washington also argued that the agents already had most of his background
    information, including his gang moniker, and that the only reason the agents asked him about
27  such information was to obtain incriminating admissions. The Ninth Circuit rejected this
    argument, explaining that "police routinely confirm booking information such as names and
28  addresses." Washington, 462 F.3d at 1133 n.1.

1    trial.  (See 3RT 630-51.)  The prosecutor refused to offer Wong immunity in exchange for his

2    testimony at trial.  (3RT 638.)  Wong's preliminary testimony was read to the jury at petitioner's

3    trial.  (3RT 775-858.)  Kalvin Williams's preliminary hearing testimony was also read to the jury

4    due to his unavailability at the time of trial.  (3RT 664-775.)

5            B.  Threat of Self-Incrimination

6            Petitioner contends that Wong was not "under [the] threat of self-incrimination."  (Ptn. 21-

7    22.)  The privilege against self-incrimination under the Fifth Amendment is invoked properly

8    when there are "'substantial hazards of self-incrimination' that are 'real and appreciable,' not

9    merely 'imaginary and unsubstantial,'" and "the existence of such a hazard is generally

10   determined from 'examination of the questions, their setting, and the peculiarities of the case.'"

11   United States v. Rendahl, 746 F.2d 553, 555 (9th Cir. 1984) (quoting United States v. Neff, 615

12   F.2d 1235, 1239 (9th Cir. 1980)).

13           Petitioner's counsel advanced at trial the very argument that petitioner presents in his

14   habeas petition.  (See 3RT 633-38.)  The trial court judge rejected the argument after allowing the

15   prosecutor and petitioner's counsel to pose questions to Wong, and after reviewing the elements

16   of the assault and gang enhancement that Wong was awaiting sentencing on.  (3RT 638-49.)  As

17   the trial court judge explained:  "It appears that the answers to the questions that have been posed

18   to Mr. Wong by both the people and the defense in this case could result in answers which would

19   lead to a - - certainly a possibility that his answers could incriminate him."  (3RT at 649.)  The

20   undersigned also finds that the threat of Wong making incriminating statements while testifying

21   at petitioner's trial was real and appreciable, and petitioner fails to demonstrate a deprivation of

22   his constitutional rights from the trial court judge's finding the same.

23           C.  Immunity for Defense Witnesses

24               1.  Standard

25           As a general rule, "[a] criminal defendant is not entitled to compel the government to

26   grant immunity to a witness."  United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir. 1991).

27   However, under certain circumstances, immunity for defense witnesses might be "necessary to

28   protect and enforce a defendant's due process right to a fair trial."  United States v. Lord, 711

1   F.2d 887, 892 (9th Cir. 1983).  The Ninth Circuit has identified those circumstances:

> For a defendant to compel use immunity the defendant must show that:  (1) the defense witness's testimony was relevant; and (2) either (a) the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to a defense witness whose testimony would have directly contradicted that of the government witness, with the effect of so distorting the fact-finding process that the defendant was denied his due process right to a fundamentally fair trial.

United States v. Straub, 538 F.3d 1147, 1162 (9th Cir. 2008); see also United States v. Wilkes, 744 F.3d 1101, 1104-09 (9th Cir. 2014) (applying Straub).

    1.  Analysis

Petitioner's proffer of favorable testimony that he would have elicited from Wong at trial satisfies Straub's relevancy requirement.  Specifically, petitioner contends his attorney would have elicited the following information from Wong:  Wong and the victim were black belts in the martial art of tae kwon do and had taken lessons since they were three years old; Wong's validated gang status, propensity to carry concealed weapons, and pending plea bargain for assault with a deadly weapon and gang enhancement; Wong's alcohol and cocaine intoxication levels as reported in Officer Topaz's report and trial testimony; and the inconsistency between Wong's inability to describe the struggle between petitioner and the victim and his clear description of the gun.  (Ptn. 22-23.)

But petitioner's claim fails on the second prong of Straub.  With respect to part (2)(a) of the Straub standard, Petitioner does not even allege that the prosecution intentionally caused Wong to invoke the right against self-incrimination, let alone that the prosecution acted with the purpose of distorting the fact-finding process.  "Undue prosecutorial interference in a defense witness's decision to testify arises when the prosecution intimidates or harasses the witness to discourage the witness from testifying, for example, by threatening the witness with prosecution for perjury or other offenses."  Williams v. Woodford, 384 F.3d 567, 601-02 (9th Cir. 2002).  Here, the prosecution of Wong's separate gang-related offense does not amount to undue

1    prosecutorial interference.  That Wong entered a plea agreement in that case suggests that the

2    prosecution sought a conviction not to intimidate, harasses, or discourage Wong from testifying,

3    but because Wong had engaged in criminal activity.

4        Petitioner similarly fails to establish part (2)(b) of the Straub standard.  The prosecution

5    did in fact grant immunity to one witness, as Kalvin Williams testified at the preliminary hearing

6    pursuant to an immunity agreement.  Moreover, Kalvin Williams's testimony "directly

7    contradicted" Wong's testimony in that they provided differing accounts of factual circumstances,

8    such as who instigated the confrontation and how many shots petitioner fired.  See Wilkes, 744

9    F.3d at 1105 ("We have found direct contradictions where witnesses offer differing accounts of

10   factual circumstances.").  But petitioner's argument fails to satisfy the other components of part

11   (2)(b) of the Straub standard.

12       First, Wong was not a "defense witness"; he testified without immunity at the preliminary

13   hearing that petitioner was the cause of the confrontation and its escalation to deadly violence.

14   Second, denying Wong immunity at trial did not have the effect of "so distorting the fact-finding

15   process that [petitioner] was denied his due process right to a fundamentally fair trial."  See

16   Straub, 538 F.3d at 1161-1162 ("A survey of our opinions suggests that in the majority of cases

17   where a defendant seeks to compel immunity for a witness . . . there will have been no distortion

18   of the fact-finding process, and the district court may deny immunity on [that] bas[i]s.").

19   Although Wong did not testify at petitioner's trial, he did testify at the preliminary hearing.

20   Petitioner not only had the opportunity to cross-examine Wong at that preliminary hearing, but

21   did in fact do so.  (See 2CT 442-83.)  Moreover, the prosecution's decision to grant immunity to

22   Kalvin Williams did not have the effect of distorting the fact-finding process, as Kalvin William's

23   immunized testimony was actually helpful to petitioner's defense.[7]  Thus, neither the prosecutor's

24   _____

25   [7]  Kalvin Williams claimed that Wong and Valdez started the confrontation, that Valdez threw the
     first punch, that he heard only one gun shot, and that he did not know who pulled the trigger.

26   Williams, 2010 WL 2224675, at *3.  The prosecution presumably granted immunity to Kalvin
     Williams expecting him to testify consistent with his interview with the police on the evening of

27   the shooting (in which he allegedly stated that Wong may have been trying to break up a fight
     between petitioner and Valdez, and that "Sandman" said "I can't believe I just shot . . . this dude"

28   before asking him not to tell anyone about the incident.).  Id.

1   offer of immunity to Kalvin Williams nor his refusal to extend the same to Wong distorted the

2   fact-finding process or deprived petitioner of a fundamentally fair trial.  Cf. Straub, 538 F.3d at

3   1162 (finding a distortion of the fact-finding process where the prosecution granted immunity and

4   other incentives to eleven of the defendant's co-conspirators while denying immunity "to the one

5   witness who had testimony that, if believed, would make the government's key witness both a

6   perjurer and possible the actual perpetrator of the crime.").  Habeas relief is not warranted on this

7   claim.

8          D.   Disclosing to the Jury that Kalvin Williams had Received Immunity

9          Petitioner complains that when telling the jury during closing arguments that Kalvin

10   Williams and Wong were "in the same boat," (5RT 1893-94), the prosecutor failed to mention

11   that Kalvin Williams had received use immunity for his testimony, (Ptn. 22).

12          First, petitioner misinterprets the prosecutor's statement that Kalvin Williams and Wong

13   were "in the same boat."   A more reasonable interpretation of the statement is that both witnesses

14   were unable to provide a complete account of the altercation between petitioner and Valdez due

15   to the fact that they were fighting with each other.  Second, petitioner does not provide any

16   authority for his suggestion that a prosecutor has an obligation to reveal to the jury that a witness

17   has testified pursuant to an immunity agreement, or that a breach of that obligation violates the

18   United States Constitution.  Cf. Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that "the

19   suppression by the prosecution of evidence favorable to an accused upon request violates due

20   process where the evidence is material either to guilt or to punishment"); Amado, 2014 WL

21   3377340, at *9 ("The prosecution is trusted to turn over evidence to the defense . . . .") (emphasis

22   added).  The transcripts from the preliminary hearing make clear that the prosecutor complied

23   with his obligation under Brady and disclosed the immunity agreement to petitioner's counsel; on

24   cross-examination, petitioner's counsel asked Kalvin Williams several questions about the

25   immunity agreement.  (See RT 220.)  Though petitioner's counsel abandoned the topic when

26   Kalvin Williams stated that he did not understand the terms of the immunity agreement, the line

27   of questioning indicates that defense counsel was aware of the agreement.  Petitioner's counsel

28   was just as capable of raising the issue to the jury as the prosecutor; the failure of either to do so

39

1    did not violate petitioner's constitutional rights.

2        Thus, the prosecutor's failure to inform the jury that Kalvin Williams testified at the

3    preliminary hearing pursuant to an immunity agreement does not warrant habeas relief.

4        E.   Admitting Wong's Preliminary Hearing Testimony

5        Petitioner contends that the trial court erred in admitting into evidence the transcript of

6    Wong's testimony from the preliminary hearing.  (Ptn. 23.)

7        The Confrontation Clause of the Sixth Amendment, made applicable to the states through

8    the Due Process Clause of the Fourteenth Amendment, requires that a criminal defendant be

9    afforded the right to confront and cross examine witnesses against him.  See Pointer v. Texas, 380

10   U.S. 400, 403 (1965).  But testimonial statements of a witness absent from trial are admissible if

11   (1) the witness is unavailable at the time of trial and (2) the defendant had a prior opportunity to

12   cross-examine the witness.  Crawford v. Washington, 541 U.S. 36, 59 (2004).  Here, Wong was

13   unavailable at the time of petitioner's trial because he had invoked his Fifth Amendment right to

14   be free from self-incrimination.  Additionally, petitioner not only had the opportunity to, but did

15   in fact cross-examine Wong at the preliminary hearing.  (See 2CT 442-83.)  Thus, admission of

16   the preliminary hearing transcripts did not violate the Constitution and does not warrant habeas

17   relief.

18       Petitioner also challenges the trial court's exclusion of the video and transcript of Wong's

19   police interview.  The trial court excluded those items on the grounds that Wong was unavailable

20   to testify at petitioner's trial, Wong was not confronted with the video or transcript at petitioner's

21   preliminary hearing, and neither the video nor the transcript was admitted at the preliminary

22   hearing.  (3RT 656.)  Because petitioner fails to elaborate on his conclusory assertion that the

23   exclusion of those items violates due process, habeas relief is not warranted.

24       F.   Petitioner's Motion to Continue Trial Until After Wong's Sentencing

25       Petitioner also contends that the trial court erred in denying his motion to continue the jury

26   trial until after Wong's sentencing because petitioner presented good cause for the continuance.

27   (Ptn 24.)  Wong had pled no contest to assault with a deadly weapon and a gang enhancement for

28   an incident occurring on January 24, 2007, and sentencing for that offense was scheduled for

                                                40

1   December 13, 2007, just nine days after the start of petitioner's trial.  (3RT 631-32.)

2            1. Standard

3       Trial courts are accorded broad discretion on matters regarding continuances.  Morris v.

4   Slappy, 461 U.S. 1, 11-12 (1983); Hernandez v. Holland, 750 F.3d 843, 858 (9th Cir. 2014).

5   While there are "no mechanical tests for deciding when a denial of a continuance is so arbitrary as

6   to violate due process," Ungar v. Sarafite, 376 U.S. 575, 589 (1964), the Ninth Circuit has

7   identified several factors relevant in determining whether the trial court abused its discretion in

8   denying a requested continuance.  See Armant v. Marquez, 772 F.2d 552, 556-57 (9th Cir. 1985)

9   (identifying the following factors:  the degree of diligence by the petitioner prior to seeking the

10  continuance; whether the continuance would have served a useful purpose; the inconvenience that

11  the continuance would have caused the court or the government; and the amount of prejudice

12  suffered by the petitioner).  "At a minimum, however, in order to succeed the [petitioner] must

13  show some prejudice resulting from the court's denial." Id.

14            2. Analysis

15      The trial court's denial of petitioner's motion to continue was not so arbitrary as to violate

16  due process, as petitioner has not shown that he was prejudiced by the trial court's exercise of

17  discretion.  In addition to the reasons provided by the trial court when denying petitioner's

18  motion, (see 3RT 658), petitioner fails to appreciate that Wong's proffered testimony at

19  petitioner's trial could be used against Wong in cases beyond the charge that Wong was awaiting

20  sentencing on at the start of petitioner's trial.  More succinctly:  Wong might not have ever

21  testified at petitioner's trial.  Thus, petitioner was not prejudiced by the trial court's denial of his

22  motion to continue the trial until Wong's sentencing because Wong might not have testified at

23  petitioner's trial even after receiving his sentence.  Because petitioner has not shown prejudice, he

24  has not established that the trial court's denial of his continuance motion was so arbitrary as to

25  violate due process.

26       G.  Conclusion on Petitioner's Immunity Arguments

27      Thus, habeas relief is not warranted on any of petitioner's claims based on the

28  prosecutor's and trial court's refusal to grant Wong immunity.

1    III.  <u>Claim Three:  Petitioner's Motion for a New Trial</u>

2        Petitioner argues that the trial court erred in denying his motion for a new trial.  (Ptn. 27.)

3    According to petitioner, because the jury found not true that he personally inflicted great bodily

4    injury upon Leon in Count One, it was factually impossible for petitioner to personally discharge

5    a firearm which proximately caused bodily injury to Leon in Count Two—an allegation which the

6    jury found true.  (Ptn. 28.)  Because these findings are irreconcilable, petitioner argues, the trial

7    court should have granted his motion for a new trial.  (<u>Id.</u>)

8        Petitioner's argument is without merit.  "We need not decide whether the verdicts were

9    actually inconsistent, for it is well-established that inconsistent verdicts may stand, even when a

10   conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to

11   support a guilty verdict."  <u>United States v. Suarez</u>, 682 F.3d 1214, 1218 (9th Cir. 2012) (internal

12   quotation marks and bracketing omitted).  Here, there is sufficient evidence to support the jury's

13   finding as to the Count 2 allegation.  On direct appeal of the conviction, the Court of Appeal

14   summarized Leon's testimony at petitioner's trial:

15
16          A neighbor urged Leon to go inside.  As Leon tried to do so, shots
            were fired from defendant's position.  Leon saw defendant pull out
17          a gun and shoot toward Leon and the house.  He did not see
            anyone else with a gun.

18          The last shot hit Leon in his big toe, breaking three bones.  It took
19          him four to six months afterward to walk correctly.  He was still in
            pain.
20

21   <u>Williams</u>, 2010 WL 2224675, at *5.  Iris Luna also testified at trial that she saw petitioner firing a

22   gun.  <u>Id.</u> at 6.  Additionally, Officer Valenzuela testified that, the day after the incident, petitioner

23   admitted to having fired several shots at Leon after picking up a gun off the hood of a nearby car.

24   <u>Id.</u> at *2.  And petitioner himself testified at trial that he shot at Leon until he ran out of

25   ammunition.  <u>Id.</u> at *7.  This testimony from four different witnesses is sufficient to support the

26   jury's finding that, with respect to Count Two, petitioner personally discharged a firearm which

27   proximately caused bodily injury to Leon.  Thus, even if there were an inconsistency in the

28   verdicts, the verdicts may stand under <u>Suarez</u>.  Claim Three does not warrant habeas relief.

IV.  Claim Four:  Sufficiency of the Evidence

Petitioner contends that the evidence is insufficient to sustain his second-degree murder conviction.  (Ptn. 32.)  His habeas petition restates the evidence presented at trial and his version of events (i.e., that Valdez produced the gun and, after a struggle for control of the weapon, "the trigger [was] pulled inadvertently striking Valdez in the neck causing his death").  (Id.)

A.  Standards

1.  Challenges to the Sufficiency of Evidence

The Fourteenth Amendment prescribes:  "No state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend XIV, § 1.  As such, "the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'"  Jackson v. Virginia, 443 U.S. 307, 315 (1979) (quoting In re Winship, 397 U.S. 358, 364 (1970)).  Accordingly, "[a] federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court."  Jackson, 443 U.S. at 318.  "[R]eview of the constitutional sufficiency of evidence to support a criminal conviction" requires a reviewing court to conduct a two-step inquiry:  "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution."  United States v. Nevils, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc).  "Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"  Id. at 1164 (quoting Jackson, 443 U.S. at 319).

2.  Murder

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."  Cal. Pen. Code § 187(a).  Malice may be express or implied.  Cal. Pen. Code § 188.  "Express malice is an intent to kill."  People v. Gonzlez, 54 Cal. 4th 643, 653, 142 Cal. Rptr. 893 (2012).  "Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for

43

1   the danger to life that the act poses." Id.; see also People v. Knoller, 41 Cal. 4th 139, 160, 59 Cal.

2   Rptr. 3d 157 (2007) ("In short, implied malice requires a defendant's awareness of engaging in

3   conduct that endangers the life of another—no more, no less."). "A person who kills unlawfully

4   with implied malice is guilty of second degree murder." Gonzalez, 54 Cal. 4th at 653; see also

5   Cal. Pen. Code § 189 (listing different means by which murder may be committed and explaining

6   that "[a]ll other kinds of murders are of the second degree").

7        "Manslaughter, a lesser included offense of murder, is an unlawful killing without

8   malice." People v. Elmore, 59 Cal.4th 121, 133, 172 Cal. Rptr. 3d 413 (2014). "Two factors may

9   preclude the formation of malice and reduce murder to voluntary manslaughter:  heat of passion

10  and unreasonable self-defense." Id. "Self-defense, when based on a reasonable belief that killing

11  is necessary to avert an imminent threat of death or great bodily injury, is a complete justification,

12  and such a killing is not a crime." Id. "A killing committed when that belief is unreasonable is

13  not justifiable.   Nevertheless, 'one who holds an honest but unreasonable belief in the necessity

14  to defend against imminent peril to life or great bodily injury does not harbor malice and commits

15  no greater offense than manslaughter.'" Id. (quoting People v. Flannel, 25 Cal. 3d 668, 672, 160

16  Cal. Rptr. 84 (1979)).  With respect to heat of passion, "[t]he provocation which incites the

17  defendant to homicidal conduct in the heat of passion must be caused by the victim, or be conduct

18  reasonably believed by the defendant to have been engaged in by the victim." People v. Lee, 20

19  Cal. 4th 47, 59, 82 Cal. Rptr. 2d 625 (1999); see also People v. Carasi, 44 Cal. 4th 1263, 1306, 82

20  Cal. Rptr. 3d 265 (2008) ("To satisfy this test, the victim must taunt the defendant or otherwise

21  initiate the provocation.").

22       B.  Analysis

23       Petitioner contests the sufficiency of the evidence with respect to his second-degree

24  murder conviction.  Thus, the inquiry is whether the evidence, viewed in the light most favorable

25  to the prosecution, is adequate to allow any rational trier of fact to find (1) an unlawful killing of

26  a human being or fetus and (2) malice aforethought.

27  /////

28  /////

44

1          1. Unlawful Killing

2              There is no dispute that Valdez was killed.  However, petitioner suggests that the killing

3     was not unlawful because "the trigger [was] pulled inadvertently" and petitioner acted in self-

4     defense.  (Ptn. 32.)  There is substantial evidence indicating otherwise:  Wong testified that he

5     heard two shots fired and saw petitioner standing over and pointing at Valdez a smoking silver

6     gun that looked like a .38 revolver; Ware testified that the victim stepped back before the gunman

7     fired two shots and put the gun back into his pocket or waist; and a forensic pathologist also

8     testified that the physical evidence was consistent with Valdez taking a step backward while

9     looking down to his right as the shot was fired.  Williams, 2010 WL 2224675, at *2-8.

10    Additionally, as the Court of Appeal observed on direct appeal:  "at trial Ware testified that after

11    defendant fired the shots 'he put the pistol *back* in his pocket or his waist' (italics added),

12    logically implying that it was there to begin with."  Id. at *13.

13             Wong's testimony is also sufficient evidence upon which the jury could find that

14    petitioner did not kill in the heat of passion, as Wong testified that it was petitioner that provoked

15    the fight and became the aggressor.  (See 2CT 430-37.)  See People v. Oropeza, 151 Cal. App.

16    4th 73, 83, 59 Cal. Rptr. 3d 653 (2007) ("A defendant may not provoke a fight, become the

17    aggressor, and, without first seeking to withdraw from the conflict, kill an adversary and expect to

18    reduce the crime to manslaughter by merely asserting that it was accomplished upon a sudden

19    quarrel or in the heat of passion.").

20             The evidence also supports a finding of malice.  The forensic pathologist testified that

21    Valdez was shot in the neck and that the shot had been fired from close range or a position

22    loosely in contact with the skin.  Williams, 2010 WL 2224675, at *8.  This testimony and that

23    identified in the preceding paragraph, viewed in the light most favorable to the prosecution, is

24    adequate to allow a rational trier of fact to find that petitioner acted with the deliberate intention

25    to end Valdez's life.  See People v. Smith, 37 Cal. 4th 733, 747, 37 Cal. Rptr. 3d 163 (2005)

26    ("[A] rational jury could find . . . that defendant acted with the intent to kill both the baby and the

27    mother when he shot at them with a large-caliber bullet from close range knowing each was

28    directly in his line of fire.").

1   Thus, the evidence viewed in the light most favorable to the prosecution was adequate to

2   allow a rational trier of fact to find that petitioner killed Valdez, with malice, and that the killing

3   was unlawful.  The evidence was therefore sufficient to support each element of the second-

4   degree murder conviction.  Thus, Claim Four does not warrant habeas relief.

5   V.  Claim Five:  Penal Code Section 12022.53(e)(1)

6   Petitioner also argues that the additional twenty-five years-to-life sentence enhancement

7   he received under Penal Code section 12022.53(d) violates the Fourteenth Amendment because

8   the prosecution failed to plead and prove Penal Code section 12022.53(e)(1).  (Ptn. 40.)

9   Petitioner received an additional twenty-five years-to-life enhancement under section

10   12022.53(d), which mandates such a sentence when a defendant "personally and intentionally

11   discharges a firearm and proximately causes great bodily injury" while committing, inter alia,

12   murder.  Cal. Pen. Code § 12022.53.

13   First, the Superior Court explained on habeas review:

> Subsection (e) allows aiders and abettors in gang-related crimes to
> be convicted under the statute.  Subsection (d), on the other hand,
> mandates a 25-to-life enhancement for personal discharge of a
> firearm causing death or great bodily injury.  Subsection (d) has
> nothing to do with aiding and abetting, and petitioner was not
> charged as an aider or abettor to the murder.

18   (Lod. Doc. 15 at 3.)  Second, petitioner's complaint is of an application of state law, and "it is not

19   the province of a federal habeas court to reexamine state-court determinations on state-law

20   questions."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); see also Roberts v. Hartley, 640 F.3d

21   1042, 1046 (9th Cir. 2011) ("A state's misapplication of its own laws does not provide a basis for

22   granting a federal writ of habeas corpus.").  Petitioner fails to articulate how the statute or the

23   sentence enhancement that the sentencing judge imposed pursuant to the statute deprived him of

24   due process.  Accordingly, Claim Five does not warrant habeas relief.

25   VI.  Claim Six:  Petitioner's Consecutive Life Terms Under Penal Code Section 12022.1

26   Petitioner argues that the trial court erred in believing that it was required to impose

27   consecutive life terms under Penal Code section 12022.1, thereby depriving petitioner of due

28   process.  (Ptn. 8, 44.)  His habeas petition quotes the sentencing judge:  "A commitment to state

1   prison is mandatory and is justified by the facts of this case, and mandatory consecutive sentences

2   are required pursuant to 12022.1(e)." (Ptn. 45.)  According to petitioner, "the court had authority

3   to grant the petitioner a dismissal on the Penal Code 12022.1 (out on bail enhancement) pursuant

4   to Penal Code section 1385 . . . ." (Id.)

5        First, according to the Superior Court on habeas review, the trial court "was correct in

6   stating that the sentence for the crime committed while defendant was out on bail was required to

7   be consecutive to the prior crime.  The court had no basis for striking one of the convictions."

8   (Lod. Doc. 15 at 3.)  Second, petitioner's complaint is of an application of state law, and "it is not

9   the province of a federal habeas court to reexamine state-court determinations on state-law

10  questions." Estelle, 502 U.S. at 67-68; Roberts, 640 F.3d at 1046.  Petitioner fails to articulate

11  how the statute or the consecutive sentence that the sentencing judge imposed pursuant to the

12  statute deprived him of due process.  Accordingly, Claim Six does not warrant habeas relief.

13  VII.  Claim Seven:  Adequacy of Appellate Counsel

14       Petitioner also contends that his appellate counsel failed to raise meritorious grounds in

15  the direct appeal, thereby rendering ineffective assistance of appellate counsel.  (Ptn. 8, 47.)

16  Specifically, he contends that appellate counsel's failure to argue Claims One through Six was

17  without legitimate strategic purpose.  (Ptn. 47.)

18       A.  Standard

19       "The due process clause of the fourteenth amendment guarantees a criminal defendant the

20  right to the effective assistance of counsel on his first appeal as of right." Miller v. Keeney, 882

21  F.2d 1428, 1431 (9th Cir. 1989) (citing Evitts v. Lucey, 469 U.S. 387 (1985)).  Courts review

22  claims of ineffective assistance of appellate counsel under the standard set forth in Strickland v.

23  Washington, 466 U.S. 668 (1984).  Moormann v. Ryan, 628 F.3d 1102, 1106 (9th Cir. 2010).

24       First, the petitioner must show that counsel's performance was objectively unreasonable,

25  which in the appellate context requires the petitioner to demonstrate that counsel acted

26  unreasonably in failing to discover and brief a merit-worthy issue.  Id.  In assessing an ineffective

27  assistance of counsel claim, "[t]here is a strong presumption that counsel's performance falls

28  within the wide range of professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 381

1   (1986) (citation omitted).  Similarly, there is a strong presumption that counsel "exercised

2   acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

3   695, 702 (9th Cir. 1990) (citation omitted).

4        The petitioner must also show prejudice, "which in this context means that the petitioner

5   must demonstrate a reasonable probability that, but for appellate counsel's failure to raise the

6   issue, the petitioner would have prevailed in his appeal."  Moormann, 628 F.3d at 1106.  A

7   reasonable probability is "a probability sufficient to undermine confidence in the outcome."

8   Strickland, 466 U.S. at 669; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

9        As both prongs of the Strickland test must be satisfied to establish a constitutional

10   violation, failure to satisfy either prong requires that an ineffective assistance claim be denied.

11   See Strickland, 466 U.S. at 697; Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to

12   satisfy either prong of the Strickland test obviates the need to consider the other.").

13        When reviewing ineffective assistance of counsel claims under AEDPA's deferential

14   standard of review, "[t]he pivotal question is whether the state court's application of the

15   Strickland standard was unreasonable[,]" which is a different question from "asking whether

16   defense counsel's performance fell below Strickland's standard."  Harrington, 131 S. Ct. at 785.

17
18
19
20
> The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

21   Id. at 788 (citations omitted).

22        B.  Analysis

23        AEDPA applies to petitioner's claim of inadequacy of appellate counsel.  Although the

24   California Supreme Court issued a summary denial, this court can look through that denial to the

25   Superior Court's decision denying petitioner's habeas petition to determine if it involved an

26   unreasonable application of law or unreasonable determination of the facts.  The Superior Court

27   reviewed each of the claims that petitioner contends his appellate counsel should have raised and

28   found that "[n]one . . . presented valid grounds for appeal, and counsel had no reason to raise

1   them." (Lod. Doc 15 at 1-3.)  The undersigned has reviewed each of those claims de novo and

2   found that they are all without merit.  Because each of the claims that petitioner contends

3   appellate counsel should have raised are without merit, petitioner cannot demonstrate appellate

4   counsel's actions prejudiced petitioner.  Accordingly, petitioner has not satisfied § 2254(d), and

5   his claim of ineffective assistance of appellate counsel should be rejected.

6   VIII.  <u>Claim Eight:  Severance</u>

7          Petitioner contends that the trial court erred in denying his motion to sever the Count

8   Three murder charge from the "unrelated" other counts, and that the joinder so prejudiced

9   petitioner that it requires reversal of his convictions.  (Ptn. 8, 80-93.)  AEDPA applies to this

10   claim because, while the California Supreme Court summarily denied the petition, the Court of

11   Appeal denied the claim on the merits on direct appeal.  Accordingly, this court reviews the Court

12   of Appeal decision to determine whether the denial was contrary to or an unreasonable

13   application of clearly established federal law or an unreasonable determination of the facts.

14          A.  <u>Federal Law</u>

15          "Improper joinder does not, in itself, violate the Constitution.  Rather, misjoinder [] rise[s]

16   to the level of a constitutional violation only if it results in prejudice so great as to deny a

17   defendant his Fifth Amendment right to a fair trial."  <u>United States v. Lane</u>, 474 U.S. 438, 446 n.8

18   (1986).  Thus, "'[t]he simultaneous trial of more than one offense must actually render [a habeas]

19   petitioner's state trial fundamentally unfair and hence, violative of due process before relief

20   pursuant to 28 U.S.C. § 2254 would be appropriate.'"  <u>Featherstone v. Estelle</u>, 948 F.2d 1497,

21   1503 (9th Cir. 1991) (quoting <u>Tribbitt v. Wainwright</u>, 540 F.2d 840, 841 (5th Cir. 1976)).

22          B.  <u>The Court of Appeal Opinion</u>

23          The Court of Appeal found that petitioner failed to show he was prejudiced by the trial

24   court's failure to sever Counts One and Two from Count Three:

25                  Defendant contends the trial court prejudicially abused its
26          discretion by denying his severance motion because (1) the
            offenses were not connected together in their commission; (2) the
27          evidence was not cross-admissible; (3) evidence admitted in
            support of counts one and two suggested defendant had a
28

49

propensity for violence, impacting the evidence used to convict defendant on count three, in derogation of the Evidence Code; and (4) the unfair joinder of the counts allowed the People to try two weak, unrelated cases together. FN18 We conclude the trial court acted reasonably within its discretion in denying the motion and the joinder of the counts did not prejudice defendant.

[FN18: Defendant does not renew his pretrial argument that the disparity in gravity of the alleged offenses weighed against joinder. His appellate argument here about improper "propensity" evidence, though not found in his pretrial briefing, was raised orally in limine. (See below.)]

There is a statutory preference for consolidating trial of separately charged offenses if "connected together in their commission," or if they constitute "different statements of the same offense or two or more different offenses of the same class of crimes or offenses." (§ 954; see Alcala v. Superior Court (2008) 43 Cal.4th 1205, 1220 (Alcala).) Because consolidation serves the important purposes of efficiency and judicial economy, the burden is on the defendant to show that these considerations "are outweighed by a substantial danger of undue prejudice." (People v. Bean (1988) 46 Cal.3d 919, 939, fn. omitted.)

Offenses are "'of the same class'" for purposes of joinder if they possess common characteristics. (People v. Leney (1989) 213 Cal.App.3d 265, 269 (Leney).) They are "'connected together in their commission'" if they share a "'common element of substantial importance'" (Alcala, supra, 43 Cal.4th at p. 1218, italics omitted)-a requirement which may be satisfied "'even though the offenses charged do not relate to the same transaction and were committed at different times and places against different victims.' [Citation.]" (Leney, supra, 213 Cal.App.3d at p. 269.)

Whether the conditions for joinder exist is a pure question of law which we review independently. (People v. Alvarez (1996) 14 Cal.4th 155, 187-188.) However, our standard of review for the grant of a consolidation motion or the denial of a severance motion is abuse of discretion. (People v. Osband (1996) 13 Cal.4th 622, 666 (Osband ).)

Consolidation may be an abuse of discretion if (1) the evidence is not cross-admissible, (2) the joined charges are inflammatory, (3) a weak case is joined with a strong case, and (4) one of the crimes is punishable by death. (Osband, supra, 13 Cal.4th at pp. 666-667.) Cross-admissibility is not required for consolidation, but suffices to negate prejudice. (Id. at p. 667.)

If joinder was proper under section 954, the defendant must make a clear showing of prejudice to demonstrate abuse of discretion. We assess the trial court's ruling based on the record when the ruling was made. However, if in hindsight it proves that consolidation resulted in gross unfairness depriving the defendant of due process of law, we would be required to find prejudice. (Alcala, supra, 43 Cal.4th at p. 1220; People v. Zambrano (2007) 41 Cal.4th 1082, 1130, disapproved on another ground in People v. Doolin (2009) 45 Cal.4th 390, 421.)

**The trial court's ruling**

Defendant does not and cannot dispute the offenses charged here were "of the same class of crimes": all were assaultive offenses allegedly committed with firearms. That fact alone justifies joinder. (§ 954; Alcala, supra, 43 Cal.4th at p. 1220; Leney, supra, 213 Cal.App.3d at p. 269.)

Furthermore, the offenses were also "connected together in their commission" (§ 954) because they had more than one "'common element of substantial importance[.]'" (Alcala, supra, 43 Cal .4th at p. 1219.) Both incidents occurred in the neighborhood defendant and his gangster acquaintances claimed as their own even after defendant had moved away. Defendant allegedly brought a gun to each crime scene, but claimed he acquired both guns by happenstance on the spot. Each time, Kalvin Williams accompanied and actively assisted him. And each time, verbal conflicts quickly escalated to deadly force. This is more than enough to satisfy this prong of section 954. (See Leney, supra, 213 Cal.App.3d at p. 269.)

Furthermore, as the trial court found, defendant's story about getting his gun on July 7 from an "O.G." (a term usually meaning "original gangster," i.e., a senior gang member) made the gang expert testimony offered as to count three cross-admissible as to counts one and two. Thus, though cross-admissibility is not required for joinder, the cross-admissibility of this evidence suffices to negate prejudice from joinder. (Osband, supra, 13 Cal.4th at p. 667.) Contrary to defendant's apparent view, the cross-admissibility criterion does not require that all the evidence in one case must be cross-admissible in the other.

Finally, the evidence before the trial court when it ruled on the severance motion did not show that counts one and two were stronger or weaker than count three. As to both incidents, interested witnesses had given conflicting accounts. Physical evidence in both incidents tended to inculpate defendant, but did not conclusively prove guilt. There was disinterested and

51

apparently credible eyewitness evidence as to count three, but not as to counts one and two. On the other hand, defendant's claim as to the first incident that someone he called an "O.G." (but who was not an "original gangster," even though that is what the abbreviation normally stands for) had furnished defendant a gun for no apparent reason, then disappeared, was so implausible as to suggest consciousness of guilt, but he had made no statement about the second incident. In short, as the trial court found, the evidentiary strengths and weaknesses of the two cases were roughly in balance.

For all of the foregoing reasons, the trial court's denial of defendant's severance motion was well within its discretion.

**Prejudice in light of the whole record**

**Propensity evidence**

Seeking to establish prejudice from joinder in hindsight (cf. Alcala, supra, 43 Cal.4th at p. 1220; People v. Zambrano, supra, 41 Cal.4th at p. 1130), defendant asserts: "[T]he admission of evidence in support of counts 1 and 2 had no purpose vis-a-vis count 3 except the inadmissible purpose of suggesting [defendant] had a propensity or the disposition to commit a crime of violence." FN19 Defendant cites the prosecutor's remarks in closing argument that because defendant, a Crip, carried and fired a gun in the first incident, the jury could conclude that he did so in the second incident as well. However, although evidence of defendant's gang ties was not directly relevant to counts one and two because Marlon Leon was not shown to belong to a rival gang and defendant's acts appeared motivated by a strictly personal feud, the gang evidence was relevant to show defendant's motive and intent as to count three (Evid.Code, § 1101, subd. (b)); thus it could not have been prejudicial as to that count. And if the jury believed defendant's testimony, it would have concluded he did not carry a gun on either occasion and would have discounted the prosecutor's remarks. If the jury did not believe defendant's testimony as to the first occasion, it was not because the counts were joined but because defendant's story about how he got the gun on that occasion was unbelievable.

[FN19: Defendant's written severance motion in the trial court did not argue that joinder would violate Evidence Code section 1101. As defendant points out, however, trial counsel belatedly raised this theory during argument in limine.]

/////

52

**"Spillover" effect**

Defendant also asserts that in light of the whole record, joinder "created a 'spillover' effect in which the inflammatory evidence from count 3 became propensity evidence as to counts 1 and 2, and vice-versa." This point is unpersuasive because defendant supports it by improperly characterizing the evidence most favorably to himself.

First, defendant states as to count three: "[T]he sole issue was, who pulled [out] the gun?" Defendant asserts that the only evidence on this point came from himself and eyewitness Earnest Ware. Then he asserts that Ware testified at the preliminary hearing that he saw defendant pull out the gun, but at trial Ware "said only that he saw Valdez step back and then saw [defendant] fire two shots." Defendant's second point is doubly erroneous. First, Ware did not testify at the preliminary hearing, and Detective Higgins's testimony in that proceeding, which conveyed Ware's account indirectly, was not before the jury. Second, at trial Ware testified that after defendant fired the shots "he put the pistol *back* in his pocket or his waist" (italics added), logically implying that it was there to begin with. FN20

[FN20: Defendant concludes that because the jury requested a readback of Ware's testimony, the case as to count three was close. Even if so, it was not necessarily because the jury doubted that defendant pulled out the gun. Rather, the close question appears to have been whether his conduct was first degree murder, as the prosecutor argued, or second degree murder, as the jury ultimately found.]

Furthermore, defendant's claim that (1) Valdez pulled out the gun while hovering over defendant, (2) defendant pushed Valdez's hand up with his own hands from below, (3) the gun went off as they struggled, and (4) Valdez fell backward only after the gun fired did not square with either Ware's account of the sequence of events or the pathologist's finding that the fatal shot was fired with the gun very close to or touching Valdez's neck as he stepped backward. The jury evidently resolved this conflict against defendant.

Lastly, to decide whether defendant's claim that Valdez pulled out the gun was credible, the jury had to put it in the context of defendant's entire story about the incident. This included the ludicrous assertion that when Valdez blocked his path and said "Norte" to him and he replied with "Freeport," he thought they were merely exchanging geographical information about the neighborhood and would then go about their business. If the jury

disbelieved that, as any reasonable jury would, it was unlikely to believe anything else defendant said about the incident.

For all of these reasons, we conclude the jury's verdict on count three did not depend on any speculative "spillover effect" from the other counts.

Defendant's reverse "spillover" argument as to counts one and two is just as inappropriately weighted in his favor. He asserts: "[I]n those charges a credibility contest even more beneficial to the defense presented itself"—the contest between his credibility and Leon's. Although Leon's credibility was seriously impeached by his prior inconsistent statements, his admitted felony conviction, and his apparent attempt to persuade Iris Luna to testify falsely, defendant's claim that he was the more credible of the two is untenable. Nothing Leon said defied credulity as much as defendant's story about the "O.G." If the jury disbelieved that story, it could not reasonably have credited anything else defendant said about the July 7 incident that rested only on his word.

Defendant finally asserts he was prejudiced from joinder in that the jury did not convict him of the gravest possible charges as to either incident, finding only second degree murder as to count three and rejecting the allegation as to count one that he personally inflicted great bodily injury. On the contrary: the fact that defendant obtained relatively lenient verdicts as to both incidents is strong evidence that the joinder of the charges did not prejudice him. (See People v. Soper (2009) 45 Cal.4th 759, 784 (Soper).) FN21

[FN21: In defendant's reply brief, he asserts that "the balancing test set forth in our Supreme Court's new Soper case" compels a finding in his favor. However, Soper cites the same factors justifying consolidation as the earlier decisions on this issue. (Soper, supra, 45 Cal.4th at pp. 774-775.) As we have documented, all of those factors are present here. Thus, even assuming Soper created a new "balancing test," it does not change the result.

Defendant's reply brief also relies on People v. Earle (2009) 172 Cal.App.4th 372, in which the court reversed a conviction on one count due to improper joinder under the Soper test. However, since the joinder issue in each case depends on the facts of that case, comparisons between different cases with different facts are unhelpful.]

Williams, 2010 WL 2224675, at *11-14.

/////

54

1        C.  Analysis

2            After reviewing the Court of Appeal's analysis of petitioner's severance claim, the

3    relevant portions of the record, and relevant Supreme Court precedent, it is clear that the decision

4    to deny the claim is not contrary to, nor does it involve an unreasonable application of clearly

5    established federal law as determined by the Supreme Court of the United States.  Petitioner

6    simply has not established that the joinder of Counts One and Two with Count Three at trial

7    prejudiced him so greatly that he was denied his due process right to a fair trial.  The Court of

8    Appeal decision is not based upon an unreasonable determination of the facts.

9            Considering these facts, the failure to sever Counts One and Two from Count Three did

10   not render petitioner's trial fundamentally unfair.  For these reasons petitioner's claim should be

11   rejected.

12   IX.  Claim Nine:  Cruel and Unusual Punishment

13           Petitioner's final claim is that the trial court erred in sentencing petitioner to "what is

14   essentially" a term of life without the possibility of parole.  (Ptn. 8, 94-99.)  He contends that,

15   under a proportionality review, petitioner's sentence clearly violates state and federal prohibitions

16   under the Eighth Amendment.  (Id.)

17           AEDPA applies to this claim because, although the California Supreme Court summarily

18   denied petitioner's argument, the Court of Appeal denied the claim on the merits on direct appeal.

19   Accordingly, this court's review of the Court of Appeal decision is limited to whether the denial

20   was contrary to or an unreasonable application of clearly established federal law or an

21   unreasonable determination of the facts.

22       A.  Court of Appeal Opinion

23           The Court of Appeal summarized, analyzed, and ultimately rejected petitioner's Eighth

24   Amendment claim:

25           Defendant contends that his sentence of 72 years to life in prison
                 (consisting of seven years determinate followed by 65 years
26           indeterminate) constitutes cruel and unusual punishment under the
                 United States Constitution and cruel or unusual punishment under
27           the California Constitution.  We disagree.  Even assuming that this

28

contention is not forfeited for failure to raise it in the trial court (see People v. Williams (1998) 17 Cal.4th 148, 161-162, fn. 6; People v. Saunders (1993) 5 Cal.4th 580, 589, fn. 5; but see People v. Norman (2003) 109 Cal.App.4th 221, 229; People v. DeJesus (1995) 38 Cal.App.4th 1, 27), it fails on the merits.

**The federal claim**

Under the proscription of "cruel and unusual punishment" in the Eighth Amendment to the United States Constitution (applicable to the states via the Fourteenth Amendment), a "'narrow proportionality principle' . . . 'applies to noncapital sentences.'" (Ewing v. California (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108, 117] (lead opn. of O'Connor, J.), quoting Harmelin v. Michigan (1991) 501 U.S. 957, 996-997 [115 L.Ed.2d 836, 866].)

Objective factors guiding the proportionality analysis include "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (Solem v. Helm (1983) 463 U.S. 277, 292.) But only in the rare case where the first factor is satisfied does a reviewing court consider the other two factors. (Harmelin v. Michigan, supra, 501 U.S. at p. 1005 [115 L.Ed.2d at pp. 871-872] (conc. opn. of Kennedy, J.).)

Defendant cannot get past the first proportionality factor. He was convicted of second degree murder, assault with a firearm, and discharge of a firearm at an inhabited dwelling, all extremely grave crimes of violence. The jury also found multiple enhancements: defendant personally used a firearm as to count one, proximately caused great bodily injury or death by personally and intentionally discharging a firearm in the commission of counts two and three, and committed the offense charged in count three while on bail on the other charges. Thus, the gravity of defendant's offenses is extreme.

Defendant asserts that his crimes were "mitigated by the manner in which they arose and were carried out." Even assuming defendant may raise this argument for the first time on appeal, it fails. As to count three, he cites only his own story about how the confrontation began, which the jury was not required to credit. As to the other counts, the jury evidently found, contrary to defendant's testimony, that he and his associates were the aggressors. In any event, offenses as to which the jury found multiple enhancements true cannot reasonably be called "mitigated."

1

> At sentencing, trial counsel argued for leniency as to the determinate term because defendant was youthful when he committed the crimes (16 at the time of the first incident, 17 at the time of the second) and had no prior criminal record. Defendant renews these points on appeal. But the trial court could reasonably find them insignificant given the nature of the offenses.

2

3

4

> Defendant's sentence did not violate the Eighth Amendment to the United States Constitution.

5

6

7   Williams, 2010 WL 2224675, at *14-15.

8        B. Analysis

9        After reviewing the entire file in this matter, the undersigned finds that petitioner is barred

10   from obtaining habeas relief under 28 U.S.C. § 2254(d). The Court of Appeal correctly identified

11   that the touchstone of any Eighth Amendment claim concerning the length of a sentence is

12   proportionality between crime and sentence. The Court of Appeal's conclusion that petitioner's

13   sentence is not grossly disproportionate to his crime and criminal history is not contrary to, nor

14   does it concern an unreasonable application of any Supreme Court authority. See Lockyer v.

15   Andrade, 538 U.S. 63, 77 (2003) (upholding the constitutionality of two consecutive twenty-five

16   years-to life sentences under the Three Strikes Law following convictions for stealing video

17   tapes); Ewing v. California, 538 U.S. 11, 30-31 (2003) (upholding the constitutionality of a

18   twenty-five years-to-life sentence for theft of golf clubs under California's Three Strikes Law);

19   Harmelin v. Michigan, 501 U.S. 957, 997 (1991) (upholding the constitutionality of a life without

20   parole sentence for possessing a large quantity of cocaine). Further, the decision is not based on

21   an unreasonable determination of the facts.

22        Petitioner also suggests that his sentence of seventy-years to life is unconstitutional under

23   Miller v. Alabama, ___ U.S. ___, 132 S. Ct. 2455 (2012), because it is essentially life without the

24   possibility of parole and he was under the age of eighteen when he committed the offenses.

25   Petitioner misreads Miller. In Miller, the Supreme Court held "the Eighth Amendment forbids a

26   sentencing scheme that mandates life in prison without possibility of parole for juvenile

27   offenders." 132 S. Ct. at 2469 (emphasis added). The Court explicitly stated that it was not

28   holding that the Eighth Amendment requires "a categorical bar on life without parole for

1   juveniles." <u>Miller</u> made clear that a sentencing judge may still sentence a juvenile to life without

2   parole in homicide cases, so long has the sentencing judge "take[s] into account how children are

3   different . . . ." <u>Id.</u>  Petitioner was not sentenced to life without the possibility of parole; rather,

4   he received a sentence of seventy-two years to life.  Moreover, because of his second-degree

5   murder conviction, the sentencing judge could have—consistent with <u>Miller</u> and the United States

6   Constitution—imposed a sentence of life without the possibility of parole, so long as the judge

7   considered how children differ from adult offenders.  Thus, petitioner's sentence is not

8   unconstitutional under <u>Miller</u>.

9        For these reasons, petitioner's Eighth Amendment claim should be rejected.

10                                   **CONCLUSION**

11        For all the reasons explained above, none of petitioner's claims warrant habeas relief.

12   Accordingly, **IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied and

13   the case closed.

14        These findings and recommendations are submitted to the United States District Judge

15   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

16   after being served with these findings and recommendations, any party may file written

17   objections with the court and serve a copy on all parties.  Such a document should be captioned

18   "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

19   he shall also address whether a certificate of appealability should issue and, if so, why and as to

20   which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

21   applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.  §

22   2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

23   service of the objections.  The parties are advised that failure to file objections within the

24   specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

25   F.2d 1153 (9th Cir. 1991).

26   Dated:  August 26, 2014

27   _____
     CAROLYN K. DELANEY
28   will0899.hc                          UNITED STATES MAGISTRATE JUDGE

                                   58